## McELRATH *v.* UNITED STATES.

1. An officer of the army or the navy was, June 20, 1866, subject to summary dismissal from the service by order of the President.

2. On the twenty-seventh day of June, 1866, the President nominated to the Senate A. to be a first lieutenant in the Marine Corps from the twentieth day of that month, *vice* B. dismissed. The Senate advised and consented to the appointment agreeably to the nomination, and A. was commissioned July 13, 1866... *Held,* that such appointment, followed by a commission, operated to discharge B. from the service as effectually as if he had been dismissed by the direct order of the President.

3. So much of sect. 5 of the act of July 13, 1866 (14 Stat. 92), as provides that "no officer in the military or naval service shall, in time of peace, be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof," did not take effect before Aug. 20, 1866, on which day, in contemplation of law, the rebellion against the national authority was suppressed, and peace restored.

4. Upon the settlement of his accounts by the accounting officers of the treasury, B., while announcing that he would not be concluded thereby, and protesting that the allowance was insufficient, received it, and brought suit in the Court of Claims to recover the balance claimed. *Held,* that the United States is not bound by the settlement, but for any moneys improperly paid him in pursuance thereof is entitled to judgment.

5. The provision of the act of March 3, 1863 (12 Stat. 765; Rev. Stat., sects. 1059–1061), authorizing that court, without the intervention of a jury, to hear and determine claims against the government, and also any set-off, counter-claim, claim for damages, or other demand on the part of the government against the claimant, does not violate the Seventh Amendment of the Constitution.

APPEAL from the Court of Claims.

On the 5th of June, 1866, Thomas L. McElrath transmitted to the Secretary of the Navy his resignation as a first lieutenant in the Marine Corps. By an official communication from the Navy Department, dated June 19, 1866, and signed by Mr. Welles, as Secretary of the Navy, he was notified that the

department declined to accept his resignation, the Secretary adding, "As you deserted from the 'Monongahela' on the eve of her sailing for the West Indies, you are hereby dismissed from the service from this date." The President, June 27, 1866, nominated to the Senate for appointment Second Lieutenant George B. Haycock of the Marine Corps to be a first lieutenant in that corps, from June 20, 1866, "*vice* Thomas L. McElrath, *dismissed.*" To that appointment the Senate gave its advice and consent; and Haycock was accordingly commissioned, July 13, 1866, to be first lieutenant, on the active list, from June 20, 1866. Thus matters stood until May 14, 1873, when McElrath made a formal application to the department for the revocation and annulment of the order of dismissal of June 19, 1866, submitting therewith evidence tending to show that he was not a deserter, as charged in the order of that date. Pending that application, he tendered, July 10, 1873, his resignation as a first lieutenant in the Marine Corps. On the same day, Mr. Robeson, then Secretary of the Navy, notified him, in writing, that "the order of June 19, 1866, dismissing you [him] from the service, is hereby revoked, having been issued under a mistake of facts." The Secretary added: "You are thus restored to the position which you held at the date of that order. The resignation which you now tender is accepted, to take effect this day."

On the eighth day of January, 1874, the claimant was further notified, in writing, by the Secretary of the Navy, as follows: "Your dismissal from the Marine Corps, as a first lieutenant, dated 19th of June, 1866, is revoked, and your resignation as a first lieutenant in that corps, tendered in your letter of the 10th of July, 1873, is accepted from that date."

Why this second notification was given is not explained, and, in the view which the court takes of the case, it is not material to inquire.

In January, 1874, the claimant made application to the Fourth Auditor of the Treasury for the settlement of his account as first lieutenant in the Marine Corps. That officer, upon examination and settlement of the account, certified to the Second Comptroller that the sum due to the claimant was $6,106.53, being the amount of the half-pay and allowances of

a first lieutenant of marines from June 21, 1866, to July 10, 1873, inclusive.   The Second Comptroller, having examined the Auditor's settlement, certified its correctness to the Secretary of the Navy, who issued his requisition, properly countersigned, upon the Secretary of the Treasury, requesting a warrant in be-half of the claimant for the amount so ascertained.   A warrant was accordingly issued, and that sum was paid to the claimant, who, at the time he received it, declared his belief that the sum was not the entire amount due him, and that he accepted the same under protest, and should hold himself in no manner concluded as to the remaining sum claimed to be due him.

All of the foregoing facts, and the further fact that the number of first lieutenants in the Marine Corps, from June 5, 1866, to July 10, 1873, was thirty, were known to the Fourth Auditor, the Comptroller, and the Secretary of the Navy when they respectively acted upon the claimant's account.

It also appears that, from June 19, 1866, to June 10, 1873, he was engaged in business in New York, earning $30 per week.   In other words, he earned in private business, when not performing service in the navy, during the above period, more than $10,000.

The present action is by McElrath to recover from the United States the balance, nearly $7,000, alleged to be due him on account of pay and allowances as a first lieutenant in the Marine Corps of the United States.   The government, denying its indebtedness to him in any sum whatever, set up a counter-claim for the sum of $6,106.53, which, it contends, was paid to him by the accounting officers of the Treasury Department without warrant of law.   A judgment was rendered in favor of the United States therefor, and he appealed.

He assigns for error that the Court of Claims erred in holding: 1. That the order of June 19, 1866, was the order of the President, and that the latter dismissed him from the Marine Corps from that date.   2. That he was not entitled to pay and allowance from June 21, 1866, to July 10, 1873.   3. That, in a suit brought in the Court of Claims against the United States, the latter can recover on a counter-claim a judgment against a claimant further than is necessary to defeat his claim.   4. That a counter-claim by the United States in the

Court of Claims which seeks an affirmative judgment for more than twenty dollars is not a suit at common law within the meaning of the Seventh Amendment to the Constitution; and that so much of sect. 3 of the act of March 3, 1863 (12 Stat. 765), as purports to confer on said court power to render such judgment, is not in violation of the Constitution; and that no part of the proceedings in this case constituted or belonged to a suit at common law within that amendment. 5. That the United States under the counter-claim could recover of the appellant the sum paid to him by the accounting officers of the treasury as half-pay and allowances for that period; viz., $6,106.53.

Mr. *Frank W. Hackett* for the appellant.

The attempted dismissal by Secretary Welles, by his letter of June 19, 1866, was illegal and void. Power summarily to dismiss a commissioned officer of the Marine Corps was at that date lodged in the President alone. Art. of War, 2 Stat. 359; *Ex parte Hennen*, 13 Pet. 230; *Gratiot* v. *The United States*, 1 Ct. of Cl. 258. The presumption that an official act of the head of a department is that of the President, appears to be founded upon the theory that, at some previous period, the President gave general directions, in conformity to which a secretary may from time to time transact public business. But this implied general authority must be confined to such ministerial acts as are within the proper sphere of the secretary's duties. On the dismissal of commissioned officers of the army or the navy by the President, the order, to be effectual and valid, if it be not signed by him, should at least purport to be an attestation of his act.

The action of the President and Senate in nominating and confirming Haycock did not indirectly have the effect of dismissing McElrath. A dismissal from an office, the incumbent whereof is removable at the pleasure of the President, may be caused by the appointment of a successor; but, until the latter is commissioned, that action vests no right in him, nor does it work the removal of the incumbent. *Marbury* v. *Madison*, 1 Cranch, 137; *United States* v. *LeBaron*, 19 How. 73. Haycock's commission was not signed till July 13, 1866. But on that day a statute went into effect providing that no

officer of the military or the naval service should in time of peace be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof. 14 Stat. 92. A Federal statute takes effect from its date. *Matthew* v. *Zane,* 7 Wheat. 164. This statute took effect from the beginning of July 13. *United States* v. *Lapeyre,* 17 Wall. 191 ; *United States* v. *Norton,* 97 U. S. 164. Congress, under art. 1, sect. 8, of the Constitution, empowering them to " make rules for the government and regulation of the land and naval forces," may restrain the implied power of the President to make summary dismissals.

The claimant is entitled to full pay and allowances from June 19, 1866, to July 10, 1873. He was debarred from active service by a cause which he could not control, and from no fault of his own. Act June 30, 1834, 4 Stat. 713 ; Rev. Stat., sect. 1612 ; Digest Decisions Judge-Advocate-General of the Army, pp. 267–268, sects. 14, 18, 19.

So much of sect. 3 of the act of March 3, 1863 (Rev. Stat. 1061), as purports to give the Court of Claims power to render judgment in favor of the United States against a claimant, is in violation of the Seventh Amendment of the Constitution, which provides that in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. *Bains* v. *The James and Catherine,* 1 Baldw. 544; *Parsons* v. *Bedford,* 3 Pet. 446; *Willard* v. *Dorr,* 3 Mas. 161. The counter-claim upon which this judgment was rendered was a suit at common law for money had and received. A counter-claim which seeks not merely to defeat the cause of action, but to obtain a distinct and independent judgment against the claimant, is not a mere incident to the original claim. It is a new suit. The original suit in the Court of Claims is not a suit at common law, but the moment the government attempts to obtain an affirmative judgment in any sum whatever against a claimant, the proceeding, so far as that judgment is concerned, becomes a suit at common law.

Unquestionably, as a general principle, Congress has the right to prescribe terms upon which the government consents to be sued. But it cannot authorize the government to sue an individual in a suit at common law, and deny him therein a

trial by jury. Nor can it do this indirectly by attaching to his right to sue the government a condition that he shall surrender a privilege guaranteed to him by the Constitution. He may, by formally giving his assent thereto, waive the right of trial by jury; but it is the duty of Congress to *preserve* the right in all suits at common law. The Court of Claims has no jury, consequently a petitioner cannot be said *sua sponte* to waive his right to one. Nor is it entirely correct to treat the right of bringing suit in the Court of Claims as a favor. *United States* v. *Klein*, 13 Wall. 144.

But conceding that the court had authority to enter judgment upon the counter-claim, the judgment itself was erroneous. The Secretary and the Second Comptroller decided that appellant was legally entitled to receive the sum paid him. The subject-matter being within their jurisdiction, it is presumed that their action was correct in point of law. *Wilkes* v. *Dinsman*, 7 How. 89. If the money was paid upon a mistake, it was a mistake of law, and according to the well-known rule it is not recoverable.

The Second Comptroller of the Treasury is a *quasi* judicial officer. His decisions have the ordinary elements of finality. *McKee* v. *United States*, 12 Ct. Cl. 532; *McKnight* v. *United States*, 13 id. 292. They are authoritative declarations of law binding on his successors, and respected in like manner as the constructions of a statute which have received judicial sanction. He has jurisdiction to determine whether or not an individual is an officer of the naval or the military forces, and as such entitled to pay and allowances.

This court does not know upon what precise grounds the Comptroller based his decision. There may have been facts presented to him which do not appear of record here. Because the appellant brought his petition in the Court of Claims, asking full pay instead of half pay for a specified period, and because certain facts are certified here from the court below, it does not follow that the payment by the Treasurer, after allowance by the Second Comptroller, was based upon these facts, and nothing else. That, though closely connected with the present proceeding, is a distinct transaction, and there may have been proof laid before the Comptroller which the appel-

lant did not make before the court below, or which is not certified up.

How is this court, for instance, to know whether or not Lieutenant McElrath's case as laid before the Comptroller came within the provisions of the act of March 3, 1865? That act (13 Stat. 489) was in force at the date of Secretary Welles's letter. It provided that in case any officer dismissed by order of the President should " make application for a trial, setting forth under oath that he has been wrongfully and unjustly dismissed, the President shall, as soon as the necessities of the public service may permit, convene a court-martial to try such officer. And if such court-martial shall not award dismissal or death as the punishment of such officer, the order of dismissal shall be void. And if the court-martial aforesaid shall not be convened for the trial of such officer within six months from the presentation of his application for trial, the sentence of dismissal shall be void."

Suppose that an officer dismissed under such circumstances had applied for a court-martial. That tribunal is not convened within six months, or, if convened, does not award death or dismissal. The statute makes the order of dismissal absolutely void. The President meanwhile has sent in to the Senate, and that body has confirmed, the nomination of another individual to fill the vacancy. Is the dismissal thus made legal and valid?

It is error to treat the Comptroller as an *agent* of the government to settle accounts rather than as a quasi-judicial officer, competent to decide the question whether or not Lieutenant McElrath was legally an officer of the navy. While his opinion upon the law of the case may be pronounced incorrect by this court, payment of money made by the government in conformity with his opinion is final and conclusive. Nor does the appellant, by bringing suit in the Court of Claims, reopen the settlement at the treasury so as to entitle the government to recover money paid in mistake of law. If this were the case of credits or allowances made in an account, it may be conceived that an action on the account would give opportunity for the defendant to restate his account; but here the government has actually paid over the money and closed the transac-

tion, so far as the question of liability to pay anything at all is concerned; the only thing remaining unsettled being the method of computation.

As there is no statute of limitation running against the United States, there would be constant danger in dealing with the government, for fear that, years after receiving one's law ful dues (as he supposes), one's heirs would be called upon to make restitution; whereas, practically, but little loss can result to the treasury from an adherence to what has proved a sound rule in transactions between individuals.

*The Attorney-General* for the United States.

McElrath held his office at the pleasure of the President, and such was the tenor of his commission.

The President's power of summarily dismissing an officer of the army or the navy, although frequently exercised from the origin of the government, was never seriously questioned. No attempt was made until 1865 to impose any limitation upon it. Sect. 17 of the act of July 17, 1862 (12 Stat. 596), did not confer the power, but rather recognized and declared its existence, and requested him to exercise it whenever the efficiency of either of those branches of the service would, in his opinion, be thereby promoted.

The letter of the head of the Navy Department of June 19, 1866, to McElrath as effectually severed his connection with the service as if it had declared in express terms that the dismissal was by order of the President. *Wilcox* v. *Jackson*, 13 Pet. 498. If this, however, were an open question, and doubts could be raised on the subject, they would be removed by the President's nominating, June 27, 1866, Haycock, *vice* McElrath dismissed, and his subsequently commissioning the former from June 20, 1866, pursuant to the appointment made by and with the advice and consent of the Senate. The record thus furnishes conclusive proof of McElrath's dismissal by the President.

Congress has power, by express grant, to make rules for the government and regulation of the land and naval forces. Whether by such rules the President's power of removal can, consistently with the Constitution, be restricted, is a question which does not arise in this case. Sect. 12 of the act of March

3, 1865 (13 Stat. 489), does not apply to McElrath, as he did not avail himself of its provisions; nor does sect. 5 of the act of July 13, 1866 (14 id. 92), for when it took effect he was not in the service.

McElrath being out of the navy, his relations to it thereafter were the same as if he had never entered it. The Secretary's pretended restoration of him in 1873 was without effect. He could only be appointed by the President in the mode prescribed by the Constitution and laws.

All the facts bearing upon the case being set forth in the claimant's petition, the issue before the Court of Claims was essentially one of law, involving the effect of the order of dismissal, its attempted revocation, and the lawfulness of the payment made, under the circumstances, by officers of the United States.

The question of the constitutionality of sect. 1061, Rev. Stat., which he discusses, does not, therefore, fairly arise; but, conceding that it does, the section has no relation to matters of defence which might be pleaded in a suit at common law. It authorizes that court to hear and determine any distinct and separate cause of action of the United States against the claimant, at the same time with his claim; and if it be less or equal to his, to set it off; and if it be greater, to render judgment for the United States. The principle is the same whether the counter-claim be greater or less than the amount to recover which the suit was brought.

The act of Feb. 10, 1855 (10 Stat. 612), first gave the formal consent of the United States to be sued. To the privilege thus conferred Congress subsequently attached the right of the government to plead a set-off, a counter-claim, a claim for damages, whether liquidated or unliquidated, or other demands on its part.

McElrath, by availing himself of the privilege, waived in the Court of Claims whatever right he possessed of trial by jury in other courts.

A set-off is merely an incident to a pending suit, and acts upon a plaintiff already in court. Congress has not attempted to bring debtors into a court where there is no trial by jury. It simply says, that when asserting rights by suit against the United States they shall be subject to its cross-demand.

A set-off did not exist at common law in suits at law. *Green* v. *Darling*, 5 Mas. 201 ; *Green* v. *Farmer*, 4 Burr. 2214.

In a recent case brought here by appeal from the Court of Claims, where the judgment upon a counter-claim was for hundreds of thousands of dollars, it was not suggested or intimated by eminent counsel that sect. 1061 was unconstitutional. *Union Pacific Railroad Co.* v. *United States*, 99 U. S. 402.

The argument of the claimant strikes at the whole existence of the court, for it was as customary to try by jury issues of fact arising on a petition of right, as those arising in suits brought by the sovereign against the subject. Tidd's Practice, tit. Extent in Chief, p. 1046.; Manning's Exchequer Practice, tit. Petition of Right, p. 85.

The receipt by the claimant of public money to which he had no right, legal or equitable, gave to the United States a cause of action.

The allowance of the claim by the accounting officers is no obstacle to a recovery. After jurisdiction to hear set-offs and counter-claims had been conferred on the Court of Claims, Congress provided, by the act of March 30, 1868 (15 Stat. 54, sect. 191, Rev. Stat.), that the balances stated by those officers upon settlements of public accounts should be subject to revision by the proper courts.

Neither the United States nor the claimant is bound by those settlements. *United States* v. *Bank of the Metropolis*, 15 Pet. 377 ; *United States* v. *Kaufman*, 96 U. S. 567.

Public money paid improperly and without authority of law by the agents of the government, may be recovered: *Cooke* v. *United States*, 91 U. S. 397 ; *Bayne* v. *United States*, 93 id. 642 ; *Attorney-General* v. *Perry*, 2 Com. 481 ; *United States* v. *Bartlett*, 2 Ware, 9 ; *Duke de Cadaval* v. *Collins*, 6 Nev. & M. 324 ; *Jones* v. *Barkley*, 2 Doug. 684, 697 ; *Muttyloll Seal* v. *Dent*, 8 Moo. P. C. C. 319 ; Evans's Essay on the Action for Money Had and Received, 28, 29.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

The first and second assignments of error proceed upon the ground that, notwithstanding the order of dismissal of June 19,

1866, and the subsequent appointment, by and with the advice and consent of the Senate, of Haycock as a first lieutenant in the Marine Corps, *vice* McElrath, the latter was never legally dismissed from the service, but was, in law, a first lieutenant in that corps during the whole period from June 20, 1866, to July 10, 1873, and as such entitled to full pay and allowances.

In discussing the questions of law involved in this position, counsel for the claimant starts with these propositions: that the order of dismissal issued from the Navy Department under the official signature of Secretary Welles was without authority of law; that the President alone, at that time, was invested with power to summarily dismiss from the service a commissioned officer of the Marine Corps; and that, since the order in question simply purported to be the act of the Secretary, and did not purport to be the act of the President, or to have been issued in pursuance of any previous direction by him given, the presumption cannot be indulged that the dismissal of Lieutenant McElrath was by order of the President.

These propositions open up a very broad field of inquiry as to what exceptions there are to the general rule that the direction of the President is to be presumed in all instructions and orders issuing from the proper department concerning executive business, notwithstanding they may contain no express statement of any direction from him as to the matters to which such instructions or orders refer. There are, undoubtedly, official acts which the Constitution and laws require to be performed by the President personally, and the performance of which may not be delegated to heads of departments, or to other officers in the executive branch of the government. It is equally true that, as to the vast multiplicity of matters involved in the administration of the executive business of the government, it is physically impossible for the President to give them his personal supervision. Of necessity he must, as to such matters, discharge his duty through the instrumentality or by the agency of others. Whether a particular act belongs to one or the other of these classes may sometimes be very difficult to determine, and we shall not attempt now to lay down any general rule upon the subject. Nor shall we extend this opinion by any consideration of the question whether the particular order,

signed by Secretary Welles, should not be presumed to have been issued by direction of the President. The determination of that question is not essential to the disposition of this case, since, if that order should, for the reasons urged by the claimant's counsel, be deemed a nullity, the nomination and confirmation, subsequently, of Lieutenant Haycock, followed by his commission, as a first lieutenant in the Marine Corps in place of Lieutenant McElrath, as certainly operated, under the law as it then was, to remove the latter from the service, as if he had been dismissed by direct order of the President under his own signature. This, because, as is conceded, the President, at the time he asked the advice and consent of the Senate to the appointment of Lieutenant Haycock in place of Lieutenant McElrath, had the power to dismiss the latter, summarily, from the service. That power, if not possessed by the President, in virtue of his constitutional relations to the army and navy (and as to that question we express no opinion), was given by an act of Congress approved July 17, 1862. The seventeenth section of that statute declared " that the President of the United States be, and hereby is, authorized and requested to dismiss and discharge from the military service, either in the army, navy, marine corps, or volunteer force, in the United States, any officer, for any cause which, in his judgment, either renders such officer unsuitable for, or whose dismission would promote, the public service." 12 Stat. 599. The message of the President informing the Senate of the dismissal of Lieutenant McElrath, and the consent of the Senate to the appointment of Lieutenant Haycock, in his stead, followed by a commission, in due form, clearly invested the latter with the office which McElrath had held, and gave him from that time the exclusive right to the pay and allowances attached to that position.

But we are here met with the suggestion that a vacancy did not exist, and Lieutenant Haycock's right to the office did not attach until he received his commission on the thirteenth day of July, 1866, on which day, and from the first moment of that day, — as is claimed upon the authority of *United States v. Lapeyre* (17 Wall. 191) and *United States* v. *Norton* (97 U. S. 164), — it was the law that "no officer of the

military or naval service shall, in time of peace, be dismissed from service, except upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof." Act of July 13, 1866, 14 Stat. 92. To this suggestion one obvious answer is, that the act of July 13, 1866, was not, on that day, in effective operation. That act assumes to control the President, in the matter of dismissing officers from the naval and military service, only in *time of peace.* Its purpose was, upon the declaration of peace, to suspend the broad power which he exercised during the recent rebellion, when prompt, vigorous action was often demanded, to dismiss an officer from the service whenever, in his judgment, the public interests would thereby be promoted. But when was the rebellion suppressed and peace inaugurated? Not until the twentieth day of August, 1866, on which day the President announced, by proclamation, that the insurrection against the national authority was at an end; and that "peace, order, tranquillity, and civil authority" then existed "in and throughout the whole of the United States of America!" 14 Stat. 814; *United States* v. *Anderson,* 9 Wall. 71; *The Protector,* 12 id. 702. The effect of that proclamation, as fixing the time when the rebellion closed, was distinctly recognized by Congress in the act of March 2, 1867 (14 Stat. 422), which declared that the previous act of June 20, 1864 (13 id. 144), increasing the pay of soldiers in the army, should be continued in full force and effect for three years "after the close of the rebellion, as announced by the President of the United States, by proclamation, bearing date Aug. 20, 1866." Since peace, in contemplation of law, could not exist while rebellion against the national government remained unsuppressed, the close of the rebellion and the complete restoration of the national authority, as announced by the President and recognized by Congress, must be accepted as the beginning of the "time of peace," during which the President was deprived of the power of summarily dismissing officers from the military and naval service.

It results that neither when Lieutenant Haycock was nominated to and confirmed by the Senate, nor when he was commissioned in place of McElrath, was the sentence of a court-martial, or any commutation thereof, required as a con-

dition precedent to the exercise by the President of the power of dismissal, or to his appointment of an officer in the service, by and with the advice and consent of the Senate.

It also necessarily follows, from what has been said, that the orders which issued from the Navy Department under the signature of Secretary Robeson, in 1873 and 1874, even if issued by direction of the President, were inoperative for the purpose of reinstating the appellant in his position as a first lieutenant in the Marine Corps. The position to which it was attempted to restore him had, as we have seen, been previously filled by constitutional appointment, and by the laws *then* in force the incumbent could neither be displaced nor dismissed, except "upon and in pursuance of the sentence of a court-martial to that effect, or in commutation thereof." The attempted restoration was ineffectual for the additional and equally conclusive reason, that the complement of first lieutenants in the Marine Corps was at that time full. The order assuming to restore him was, of course, for the reasons already given, equally inoperative to entitle him to pay and allowances for any portion of the period covered by the account settled by the officers of the treasury. The requisition upon the Secretary of the Treasury by the Secretary of the Navy was, consequently, without warrant of law. During the period for which the appellant was allowed half-pay he was not an officer in the service, and the allowance to him of pay, after the appointment of his successor, was illegal.

We come now to inquire whether the Court of Claims erred in awarding judgment against the appellant for the amount paid to him out of the treasury of the United States upon the settlement of his accounts.

Upon this branch of the case counsel for the claimant contends that so much of the act of March 3, 1863, as invests the Court of Claims with power to render judgment in favor of the United States against a claimant, is in violation of the Seventh Amendment of the national Constitution, which provides that in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.

That section, referring to the trial of causes in which the

government may plead against the claimant any set-off, counter-claim, claim for damages, or other demand, provides that the court shall, hear and determine such claim and demand both for and against the government and claimant; and if, upon the whole case, the court finds that the claimant is indebted to the government, it " shall render judgment to that effect, and such judgment shall be final, with the right of appeal, as in other cases provided for by law." There is nothing in these pro-visions. which violates either the letter' or spirit of the Seventh Amendment. Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defence, or to any set-off, or counter-claim which the government may assert, are not controlled by the Seventh Amendment. They .are not suits at common law within its true meaning. The government cannot be sued, except with its own consent. It can declare in what court it may be sued, and prescribe the forms of pleading and the rules of practice to be observed in such suits. It may restrict the jurisdiction of the court to· a consideration of only certain classes of claims against the United States. .Congress, by the act in question, informs the claimant that if he avails himself of the privilege of suing the government in the special court organized for that purpose, he may be met with a set-off, counter-claim, or other demand of the government, upon which judgment may go against him, without the intervention of a jury, if the court, upon the whole case, is of opinion that the government is en-titled to such judgment. If the claimant avails himself of the privilege thus granted, he must do so subject to the conditions annexed by. the government to the ·exercise of the privilege. Nothing more need be said on this subject.

The remaining objection against the judgment in favor of the government upon its counter-claim deserves notice at our hands. It is, in substance, this: That the Secretary of the Navy the Second Comptroller, and the Fourth Auditor hav-ing ex·mined the claim of Lieutenant McElrath, and, with full knowledge of all the facts, decided that he was legally entitled to half-pay and allowances for the period in question, the amount paid him .cannot be reclaimed because of the sub-sequent discovery that, in point of law, he was not an officer in

the Marine Corps during the period for which he was allowed such half-pay. This view is controverted by the Attorney-General, who contends that the right of the government to reclaim money paid out of the treasury under a mere mistake of law is not subject to the same limitations which, under like circumstances, would be applied between individuals. The Attorney-General goes even further, and insists that whether the mistake be one of fact or of law, or of both, the government may always recover from third persons money improperly paid out of the public treasury by its accounting officers, not in pursuance of previous judicial determination. Whether the one or the other of these views, in the broad terms in which they are announced, is correct, we will not now inquire. For if the general rule applicable in such cases would preclude the government from reclaiming money which had been paid under a mistake of law simply, that rule is inapplicable under the circumstances disclosed in the present case.

Had the appellant rested upon the settlement of his account by the proper officers of the government, his right to invoke the general rule, to which we have referred, would have been entitled to more consideration than it can now receive. Upon receiving the amount awarded to him by the representatives of the government, he distinctly announced his purpose not to abide by their settlement of his accounts; but, in disregard thereof, to demand an additional sum upon the basis of full pay and allowances from June 20, 1866, to July 10, 1873.

This suit itself invites the court to go behind that settlement, to re-examine all the questions arising out of the appellant's claim for full pay and allowances, and to correct the error which he insists was committed to his prejudice by the accounting officers of the government. The government, declining to plead the settlement of 1874 in bar of the suit, meets him upon his own chosen ground, and, insisting that its officers, misapprehending the law, paid to him out of the treasury money to which he was not legally entitled, asks, as we think it may rightfully do, judgment for the amount thus improperly paid to him.

*Judgment affirmed.*