Bichardson, Oh. J.,
delivered the opinion of the court:
The claimant Barnes entered into two written contracts with the Board of Public Works to do a large quantity of work upon different streets in Washington at a scale of prices specifically stated. These contracts, set out in Finding I, dated respectively April 29, 1872, and July 23, 1872, were made in *383 conformity with, the provision of the original act establishing the Board (Act of February 21, 1871, ch. 62, sec. 37, 16 Stat. L.3 427), which required that
u All contracts made by the said Board of Public Works shall be in writing, and shall be signed by the parties making the same, and a copy thereof shall be filed in the office of the secretary of the District; and said Board of Public Works shall have no power to make contracts to bind said District to the payment of any sums of money except in pursuance of appropriation made by law.”
The principal and most important controversies grow' out of provisions which are substantially alike in both contracts, fixing the following prices:
“ Grading, 30 cents for each and every yard of earth, sand, or gravel excavated and hauled a distance not exceeding two hundred (200) feet and one cent additional per cubic yard for every two hundred (200) feet beyond the above. (Contract 264, Finding I.)
“ Grading, thirty (30) cents per cubic yard, including the first two hundred (200) feet of hauling.
“ For every additional two hundred (200) feet of hauling, per cubic yard, one (1) cent. (Contract 314, Finding I.)”
Notwithstanding these express agreements, the claimant demands higher rates for the hauling and for part of the grading, and founds his demands upon certain memoranda'entered upon the records of the Board of Public Works.
It appears, as shown in Finding II, that the Board was accustomed to fix prices for different kinds of work by making memoranda upon their records, with notices to their contract ■clerk and auditor.
It was the duty of the contract clerk to write out the formal contracts entered into, or fill out the printed blank forms commonly in use, and to have them properly executed and copies filed with the secretary of the District, as provided by the organic act establishing the Board, and of the auditor to examine, state, and approve accounts in accordance with the contracts of the parties, entering the prices himself or correcting them when made by the engineer, to conform to the contract.
These rates, which came to be known and familiarly called -;i Board rates,” to distinguish current and future rates from previous written contract rates, were changed, from time to time, and subsequent written contracts and extensions thereof ■were made in conformity to the latest changes.
*384 In many written contracts and extension of contracts, instead of inserting a scale of prices, it was agreed to pay “ Board rates,” as in the first extension of the claimant’s first contract, No. 264, or “ the price established and paid by the Board of Public Works of a similar character,” as agreed in all the other six extensions of the contracts, as set out in Finding I.
These formula appear in other contracts and extensions which have been before us in the litigation under the jurisdictions conferred by the District Claims Act. In all such cases the current Board rates thereafter became or were to be made the written contract rates.
Until about a year after the dates of the claimant’s contracts, no attempt, or indication of an intention, on the part of the Board of Public Works to apply newly established Board rates to pre-existing contracts anywhere appears. . When urged to that, the Board notified the chief engineer, under date of July 17,1872, as appears in Finding II, that “ inasmuch as frequent applications are being made to the Board for the allowance of the advanced rates for work done previous to such increase, it is their desire and intention to adhere strictly to the old rates applicable to contracts made prior to the increase, and to allow the latter only on contracts since awardedP
This was a wise position to stand upon, sound in law and safe in practice. But they at last departed from it as to compensation for hauling earth.
On the 15th of July, 1873, the Board entered upon its records and notified the contract clerk and auditor “ that the price for hauling earth had been established at 1J cents per cubic yard for every 100 feet of haul over the first 200 feet since Junel, 1873,” and on the 27th of September, 1873, “that in settlements of accounts for extra haul 1:¡- cents per cubic yard for each additional 100 feet beyond the first 200 feet for all work done since January 1,1873, be allowed.” (Fiding II.) As a direction to subordinate officers in the drawing and settling of future contracts this was within their authority, but existing contracts could not be thus altered so as to bind the District to new and greater obligations. Such attempted alterations would constitute new contracts, required, as we have seen, to be in writing and signed by the parties. Yet the claimant demands the increased rates for all work done after January 1, 1873, under his then existing written contracts entered into a *385 year or more previously to these memoranda. The only plausible reasons for the application of these memoranda to previously made and still existing written contracts, which can be inferred, are to be found in a letter from' the auditor to the Board under date of September 23,1.873, four days before the last order, where he says:
“ I find that the item of haul, &c., gives constant rise to questions with the contractor as to the amount allowed therefor.
“At present it stands at 1¿- cents per yard for every yard hauled 100 feet over 200 feet,, for all work done since June 1, 1873. Yet the Board, in a few instances, have granted the Accents for work done prioi to that date, and all contractors claim the same amount, {in view,’ as they say, ‘ of the fact that they have to stand a discount of 20 per cent, on their paper.’ (Finding If.)”
The increase, however, is too much out of proportion to the discount to entitle the latter to be taken as a consideration for the former, even if any ¿mount of discount to which the paper was subject could be so considered, and it does not appear that this particular contractor, the claimant Barnes, suffered at all by any discount whatever. Nor was the fact that the Board had in a few instances granted the new" prices for old work under old contracts any consideration for payment in like manner on all outstanding written contracts. In reality this increase as to pre-existing contracts was nothing more nor less than a gratuity, which the Board directed the auditor to allow to contractors, and which they had no authority to grant from public funds. These memoranda were not signed by anybody as contracts were by law required to' be signed, were unilateral, and not addressed to claimant, and he was not privy to them. They undertook to give additional compensation to contractors at ' 150 per cent, above their written contract agreements; mak- • ing every $100,000 of work at contract price cost the District $250,000. '•
It was to prevent such proceedings as this by authority ór sanction of the legislature that Congress, in the statute organizing the District government and the Board of Public Works, enacted the following section:
“ Sec. 16. The legislative assembly shall never grant or ah- ' thorize extra compensation, fee, or allowance to any public officer, agent, servant, or contractor after such service has been rendered or a contract made, nor authorize the payment of any *386 claim or part thereof hereafter created against the District under any contract or agreement made without express authority of law; and all such unauthorized agreements or contracts shall be null and void. (Act of February 21, 1871, ch. 62, sec. 15, 16 Stat. L., 423.)”
It was the consummation of just such pernicious and illegal practices by the Board ofPublic Works that contributed to swell the debt of the District of Columbia to more than $20,000,000. The gratuitous distribution of public money, under whatever pretense, was not within the legitimate and legal powers of the Board of Public Works.
The general corporate powers of the District were vested in the legislature and governor, while the Board of Public Works was a body of limited jurisdiction, with their method of making contracts expressly defined, and the contracts themselves limited to appropriations made by law.
That the legislative branch of the government apparently might know exactly what contract obligations the Board of Public Works assumed, the statutes required not only that all contracts should be in writing and signed by the parties, but that copies should be “filed in the office of the Secretary of the District,” who was an officer of the District government, and not of the Board of Public Works.
.The questions, then, are: Can this court enforce claims fouiided upon these memoranda of the Board of Public Works'? Could the Board of Audit rightfully allow any such claims'? Could the Board of Public Works legally pay them ?
In the numerous cases which have been before us under the District Claims Act we have uniformly and unanimously held otherwise; and now, after having completed nearly all the business under that act, we see no reason for changing our rulings. (Roche’s Case, 18 C. Cls. R., 227; O’Hare’s Case, 18 C. Cls. R., 646; Campbell and Eslin, 18 C. Cls. E., 193; Little’s Case, 19 C. Cls. R., 327; Barnard’s Case, 20 C. Cls. R., 257; Sanders’s Case, 20 C. Cls. R., 337; Betts’s Case, 20 C. Cls. R., 445.)
When a statute provides now contracts by public officers shall be made, an entire or material departure from such requirements, though sufficient at common law to bind the parties, renders the proceedings void and of no effect as obligations on either side. It has been so decided by the Supreme *387 Court in the South Boston Iron Company Case (118 U. S. R., 37), affirming the j udgment of this court (18 C. Cls. R., 165). In that case the statute passed upon by the court is in language much less mandatory than the one we are now considering, and there were offers and acceptances in writing, signed separately by the parties, but the court held that they did not constitute a contract within the terms of the statute.
Legislative enactments must be taken notice of and complied with by persons dealing with public officers.
In Pierce v. The United States (7 Wall., 666, and 7 C. Cls. R., 72) the Supreme Court said: “ Our statute books are filled with .acts authorizing the making of contracts with the Government through its various officers and Departments; but in every instance the person entering into such a contract must look to the statute under which it is made and see for himself that his contract comes within the terms of the law.” As in the cases cited, so in this we must hold that the defendant is not bound by the memoranda, which were not put in the form of a written contract and signed by the parties.
We are aware that in Dillon on Corporations it is said:
“§ 477 [398]. Settlement of disputed claims, etc. — Growing out of its authority to create debts and to incur liabilities a municipal corporation has power to settle disputed claims against it, and an agreement to pay these is not void for want of consideration. If it has obtained a contract which, by mistake or & change of circumstances, it deems to operate oppressively upon the other party, an agreement to make an additional compensation, or to modify or annul it, is not invalid for want of consideration.”
It will be seen that the author is considering specially disputed claims, and his language must be limited by the following six decisions cited by him, all of which we will review:
In Petersburg v. Mappin (14 Ill., 193) it was held that “a settlement of an existing controversy by the trustees [of a town] binds the corporation, although they cannot dispose of its property by way of gratuity.”
Board, of Supervisors, etc., v. Bowen (4 Lansing, 24) was a case of compromise of a suit at law pending an appeal.
In Bean v. Jay (23 Maine, 121) the inhabitants of a town, not its officers, in open town meeting, voted to pay for the support of a particular pauper above contract price for the whole, and the court found there was a consideration under the circumstances.
*388 In Nelson v. Milford (7 Pick., 18) the inhabitants of a town,, not its officers, voted to indemnify their assessors for money which the latter had refunded on account of an illegal assessment, and the court 'said it was for a sufficient consideration.
In Meech v. City of Buffalo (29 N. Y., 198, 210) a contractor fór building a sewer stopped in the midst of the undertaking because he came upon “a body of quicksand below the surface of the earth of great extent, and directly in the line of the sewer, the existence of which was unknown to both parties and could not have been anticipated by either of them.” He petitioned the common council for additional pay, and “would have abandoned, the work in its incomplete and unfinished state unless the additional allowance were made to him as an indemnity for the loss which he would have sustained by reason of the quicksand, and this intention was known to the common council.” An increase, which was found to be reasonable, was voted, and the court held that it was upon a sufficient consideration.
The case of The People v. Stout (23 Barbour, 149) is a very strong one against the present claimant on the point that he had no contract made as the law required. In that case the work furnished upon an oral order was not allowed to be paid for at any price. We quote from the head-note:
■ “ In the city and county of New York the board of supervisors are restrained by statute from entering into any contract for work to be done or supplies furnished for the corporation involving an expenditure of more than $250, except by contract founded on sealed bids or on proposals made in compliance with a public notice of ten days, which contracts shall be given to the lowest bidder with adequate security. Therefore where work amounting to over $250 is done without any public notice being given for bids or sealed proposals and without any bids or proposals having been received or any contract being executed, and the accounts for such work are audited and allowed by the board of supervisors, their act in auditing and al-. lowing them is a mere nullity, and it is the duty of the county treasurer not to pay the accounts; and a mandamus compelling him to pay them will not be granted.”
It is evident from these, his citations, that the learned author, when he wrote the above-quoted section 477,'did not have in view a case like the one now under consideration.
Besides the claim for extra pay above contract rates for hauling earth there is a claim for grading old gravel streets at 40 *389 cents a cubic yard instead of 30 cents, fixed by the contract, without specifying any different kinds of grading. Like the claim for hauling earth, it is founded, not on a written contract signed by the parties, but upon memoranda of the Board •of Public Works, with notice to the contract clerk, in this instance made previous to the contracts.
It appears that on September 14,1871, the Board, by a memorandum on their records, fixed the price of grading at 20 cents .per cubic yard, and twelve days later, September 26, probably before any contracts were signed, they resolved that the price did not apply to old graveled streets ordered to be cut down, but that they would allow 40 cents for such grading, and “ that the chief of the bureau of contracts be notified of this action/ (Finding II.)
It is to be presumed that the contract clerk thereafter, as was his duty, made out all contracts according to that resolution until January 22,1872, when the Board entered of record another order. They then ordered “that the prices of grading be fixed from and after this date at 30 cents per cubic yard,” thus taking a mean between the two former prices of 20 and 40 cents, and fixing one uniform rate for all grading at 30 cents per cubic yard.
The claimant’s two contracts were made subsequently to the latter date, in the months of April and July then next following, and they conform, as to the price of grading, to the then most recent order of 30 cents per cubic yard. Had any different rate for different kinds of grading been intended they should have, and no doubt would have, been set out in the formal written contracts, since those contracts specified exactly what streets were to be graded at 30 cents per cubic yard, and both parties knew whether any portion of them were old .graveled streets or not, and yet made no exception.
In our opinion, the claimant is bound by his contracts at 30 cents per cubic yard for all grading which he did under them, and can not hold the District to pay 40 cents a cubic yard under a pre-existing order of the Board of Public Works not reduced to writing and signed by the parties as required by law.
This claim is identical with one of those in Hooke’s Case (18 C. Cls. R., 225), which we held could not be maintained.
There is still an'other claim of 30 cents a yard extra for the excavation of “ stiff clay,” which occurred in the grading of North *390 Carolina avenue (Finding III). By his contract, No. 264, said Barnes agreed to grade that street, and the only compensation agreed upon was “30 cents for each and every cubic yard of earth, sand, or gravel excavated.” Under that- agreement he excavated 63,816 yards, of which about one-third was “ stiff clay.”
Whether or not “ stiff clay ” properly comes within the terms “ earth, sand, or gravel,” in all connections, we think the contractor is not entitled to extra pay for excavating it in this case. The grading of a particular street named was the work contracted for, and not the removal of “ earth, sand, and gravel,” and the clay found in the material excavated was incidental to the work, and intended, it seems to us, to be covered by the price agreed upon per yard. The contractor excavated the whole under his contract without objecting and without notice to the other party that he claimed that any of the work was-not embraced in his contract price and that he should demand extra pay for stiff clay, until the whole was completed. This, we think, was an acquiescence in the construction that the contract price per yard covered the whole work, as claimed by the defendant and their officers.
The stiff clay, which is one kind of earth, rendered the grading in some places, no doubt, more difficult than it would have been had the earth been of a lighter material, but by the sixth article it was agreed, among other things, that all loss arising out of the nature of the work to be done, or from any unforeseen obstructions or difficulties encountered in the prosecution of the same, should be sustained by the contractor.
Holding, as we do, that the claimant can recover only the written contract rates, the further question remains whether or not the defendant shall be credited with the excess above such rates allowed or paid to him through the Board of Audit and the Board of Public Works, and upon the plea of counterclaim or set-off shall have judgment for the difference between such excess and the amounts otherwise found due him on his accounts.
It is a matter of public local history, made familiar here in Washington, if not elsewhere, through exciting Congressional investigation, that at the time of the passage of the District Claims Act, June 22, 1880 (Supplement to B. S., § 562), and pre *391 viously, it was understood that the accounts and settlements of the Board of Public Works and of the Board of Audit were in great confusion; and the numerous difficult cases which have been brought here upon thos¿ accounts have proved the correctness of that impression.
Congress by that act gave to this court jurisdiction legal and equitable, among other things of “ all claims now existing against the District of Columbia arising out of contracts made by the late Board of Public Works and extensions thereof made by the Commissioners of the District of Columbia,” to have “ the same power, proceed in the same manner, and be governed by the same rules, in respect to the mode of hearing, adjudication, and determination of said claims as it now has in relation to the adjudication of claims against the United States.” By section 3 it is made the duty of the Attorney-General to defend the District of Columbia “ in like manner as he is now by law required to defend the United States in said court, with the same power to interpose counter-claims and offsets against claims and defenses for frauds practiced or attempted, and all other legal defenses with like power of appeal as in cases against the United States tried in said court.”
The jurisdiction of the court as to counter-claims is given in sections 1059 and 1081 of the Devised Statutes, as follows:
“Second. All set-offs, counter-claims, claims for damages, whether liquidated or unliquidated, or other demands’whatsoever, on the part of the Government of the United States against any person making claim against the Government in said court.
“Sec. 1061. Upon the trial of any cause in which any set-off, counter-claim, claim for damages, or other demand is set up on the part of the Government against any person making claim against the Government in said court, the court shall hear and determine such claim or demand both for and against the Government and claimant; and if upon the whole case it finds that the claimant is indebted to the Government, it shall render judgment to that effect, and such judgment shall be final, with the right of appeal, as in other cases provided for by law.”
We have no doubt Congress intended, as we have held from the beginning, that when claimants come into court under the District Claims Act all their accounts and settlements which either party put in issue by plea or counter-claim are opened for adjudication on princioles of law and equity.
*392 In the first ease wherein the question arose (Neitzey’s Case, 17 C. Cls. R., 122), the defendant relied upon a certificate of measurement by the engineer of the Board of Public Works as conclusive, upon the ground that the contract expressly provided that all measurements should be made by the engineer, that no money should become due and payable except upon the certificate of said engineer, and that the contractor should not be entitled to demand or receive payment for any portion of his work except in the manner set forth in that agreement. But the court held that the certificate was to be taken as prima facie evidence only in the settlement and adjudication in this court under that act, and upon the claimant showing an error of measurement in the certificate it was corrected. This was followed by cases in which accounts were corrected as to over-payments upon the showing of the defendant, and counter-claims therefore were sustained. (Brown’s Case, 17 C. Cls. R., 402; Campbell and Eslin, 18 C. Cls. R., 193; Roche’s Case, 18 C. Cls. R., 217; Lyon’s Case, 19 C. Cls. R., 642; Barnard’s Case, 20 C. Cls. R., 257; Looney’s Case, 19 C. Cls. R., 230, affirmed on appeal; Sanders’ Case, 20 C. Cls. R., 337; O’Hare’s Case, 18 C. Cls. R., 646, affirmed on appeal; Shipman’s Case, 18 C. Cls. R., 291, findings 32, 33, pp. 318, 319, Opin., p. 337, affirmed on appeal.)
The question here involved, however, is not necessarily whether or not the defendant, in an independent suit against the claimant, could recover back the amount of overpayments credited or paid.
The claimant has of his own motion brought- these contracts and extensions before the court and has invited the issues which the defendant tenders. If he seeks a settlement of parts of his several contracts he can not complain if the defendant asks to have the whole accounts under the same revised and restated. The subject in that view has heretofore been considered by this court and the Supreme Court, and the law so declared (McElrath’s Case, 102 U. S. R., 441, affirming the judgment of this court, 12 C. Cls. R., 312; Brown’s Case, 17 C. Cls. R., 421; McKee’s Case, 12 C. Cls. R., 560.)
As to the counter-claims in this case, it appears by Finding 12 that the first is for overpayment made by the Board of Audit upon final settlement. Partial payments had previously been *393 made by the Board of Public Works upon certificates of partial measurements made by the engineer, in which grading was put down at 40 cents a yard, 10 cents above contract rates, and hauling at 1J cents per 100 yards haul per 100 feet above 200 feet, which was in excess of written contract rates. The Board of Audit restated the account and allowed and paid the higher rates in each case.
The second item is for overpayment by the Board of Audit, upon final settlement, above written contract rates, adopting the higher current rates as put down in the certificate of partial measurements.
The other two items were overpayments made by the Board of Public Works upon certificates of partial and final measurements made by the engineer.
It was the duty of the engineer to give certificates of partial and final measurements and not to enter prices. The fact that the engineer did carry out the prices according to the memo-randa of the Board, and the auditor approved them, adds no strength to the claimant’s case as urged in his behalf. The written contracts of the parties, and not the certificates of subordinate officers, govern the amount rightly and legally due and payable.
The powers and duties of the Board of Audit have been defined by this court and by the Supreme Court. The latter said in the case of District of Columbia v. Cluss (103 U. S. R., 706), “ That Board was not a judicial body whose action was final; it exercised little more than the functions of an accountant. A claim allowed by it was not necessarily a valid one$ a claim disallowed was not, therefore, illegal. Its action either way left the matter open to contestation in the courts.”
We have followed that decision in the several cases before cited, and have uniformly opened the settlements and restated the accounts of the parties on both sides.
The Board of Public Works had functions different from those of an accountant, but still special and limited. They were public officers, agents, or trustees, acting for others, and were bound to follow the law, keep within the scope of their authority, and act in good faith for their principal. This all parties dealing with them were bound to know (Whiteside's Case, 93 U. S. R., 257; McCullom's Case, 17 C. Cls. R., 102, 103).
*394 Payments made by such direction of the Board were as wrongful and illegal as were the memoranda upon which they were founded. The claimant had no right to accept and has no right to retain public money paid upon an illegal order.
There is no protection for the tax-payers against the waste of public money unless courts hold all persons dealing with public officers, as well as the officers themselves, to a strict responsibility and accountability for their acts and for the legality and correctness of all transactions between them when brought into litigation.
The doctrine that money paid can be recovered back when paid in mistake of fact and not of law does not have so general application to public officers using the funds of the people as to individuals dealing with their own money where nobody but themselves suffer for their ignorance, carelessness, or indiscretion, because in the former case the elements of agency and the- authority and duty of officers, and their obligations to the public, of which all persons dealing with them are bound to-take notice, are always involved (McElrath’s Case, 12 C. Cls. R., 216, 217, and cases cited, affirmed on appeal). Even between individuals the doctrine is often too broadly stated, and is not without exceptions. (Ellsworth's Case, 14 C. Cls. R., 394, 395, citing McKee’s Case, 12 C. Cls. R., 551, and cases there referred to; Snell v. Insurance Company, 98 U. S. R., 90.)
The claimant coming into court for a final settlement with the District, and having received public money to which he had no legal claim, must be held liable to refund it.
The judgment of the court is that on the whole case the defendant recover of the claimant Barnes the sum of $11,074.11, and that the intervening petitions of Samuel J. Ritchie, as-signee, be dismissed.
Nott and Davis, JJ., were absent when this case was argued, and took no part in the decision.