# Centralizing Border Control Policy Under the Supervision of the Attorney General

In general, the President may not transfer the functions of an agency statutorily created within one Cabinet department to another Cabinet department without an act of Congress.

The President may not delegate his presidential authority to supervise and control the executive departments to a particular member of the Cabinet where no statutory authority exists to do so.

The President may exercise his own power to establish a comprehensive border control policy for the federal government and direct a single Cabinet member to lead and coordinate the efforts of all Cabinet agencies to implement that policy.

March 20, 2002

LETTER OPINION FOR THE DEPUTY COUNSEL TO THE PRESIDENT

You have asked us to provide our views concerning what actions the President can take unilaterally and without congressional consent towards centralizing border control policy for the United States Government under the supervision of the Attorney General of the United States.

Under current law,[*] the federal government's control over the flow of people and goods into and out of the United States is divided among several agencies in different Cabinet departments, rather than centralized in a single department. The Immigration and Naturalization Service ("INS") is statutorily housed in the Department of Justice, the U.S. Customs Service in the Department of the Treasury, and the U.S. Coast Guard in the Department of Transportation. Thus, each agency is headed by a different Cabinet secretary, each of whom, as principal officers of the federal government, reports directly to the President.

In general, the President may not transfer the functions of an agency statutorily created within one Cabinet department to another Cabinet department without an act of Congress. We likewise believe that the President may not effectuate that very same transfer simply by delegating his presidential authority to supervise and control the executive departments to a particular member of the Cabinet, at least where no statutory authority exists to do so. However, the President may exercise his own power to establish a comprehensive border control policy for the federal

---

[*] Editor's Note: The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, established the Department of Homeland Security ("DHS") as a Cabinet-level department and reorganized the allocation of statutory duties respecting border control policy that were the subject of this opinion. *See* 6 U.S.C. § 111(a) (Supp. II 2002) (establishing DHS); *id*. § 202(2)-(6) (listing DHS's border control responsibilities); *id*. § 211(a) (establishing within DHS the United States Customs Service); *id*. § 251 (transferring to DHS certain functions of the Immigration and Naturalization Service); *id*. § 291(a) (abolishing the Immigration and Naturalization Service); *id*. § 468(b) (transferring to DHS the functions of the Coast Guard).

government, and then direct a single Cabinet member to lead and coordinate the efforts of all Cabinet agencies to implement that policy.

## I.

The Constitution expressly provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. He alone is charged with the power to nominate the principal officers, *id*. art. II, § 2, cl. 2, and to "take Care that the Laws be faithfully executed," *id*. art. II, § 3. It is thus well established that the President is "not only the depositary of the executive power, but the responsible executive minister of the United States." *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 463 (1855).

The scope of the President's executive power is limited, however, by the terms of all valid acts of Congress. Under the Constitution, it is Congress, not the President, that "make[s] all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

Accordingly, Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President. The executive power confers upon the President the authority to supervise and control that official in the performance of those duties, but the President is not constitutionally entitled to perform those tasks himself. It has long been established that, "[i]f the laws . . . require a particular officer by name to perform a duty, not only is that officer bound to perform it, but no other officer can perform it without a violation of the law; and were the President to perform it, he would not only be not taking care that the laws were faithfully executed, but he would be violating them himself." *The President and Accounting Officers*, 1 Op. Att'y Gen. 624, 625 (1823). Instead the President may control the officer through various means such as the threat of removal. *See*, *e.g*., *The Jewels of the Princess of Orange*, 2 Op. Att'y Gen. 482, 489 (1831) (although the President "could only act through his subordinate officer . . . who is responsible to him, and who holds his office at his pleasure," the power of "removal of the disobedient officer, and the substitution of one more worthy in his place," would enable the President, through him, faithfully to execute the law").

We therefore conclude that the President may not transfer the statutory duties and functions of a bureau in one Cabinet department to another Cabinet department without an act of Congress. This Office has long held that transfers of statutory authority from one department to another "may normally be accomplished only by legislation or by executive reorganization under the Reorganization Act." *Litigating Authority of the Office of Federal Inspector*, *Alaska Natural Gas Transportation System*, 4B Op. O.L.C. 820, 823 (1980); *see also Department*

*of Labor Jurisdiction to Investigate Certain Criminal Matters*, 10 Op. O.L.C. 130, 132 (1986) (same). The Reorganization Act, 5 U.S.C. §§ 901 *et seq.*, once provided the President with a mechanism for instituting "executive reorganization" plans, subject to congressional veto, but Congress retired that authority at the end of 1984, *see* 5 U.S.C. § 905(b).

## II.

It has been suggested that the President might reorganize government operations without running afoul of the law simply by delegating to a particular individual the President's own constitutionally based executive power to supervise and control certain executive functions. Under this theory, the President could effectively transfer power over a particular matter from one Cabinet department to another by delegating to the head of that department the President's power to supervise and control the actions of a subCabinet official in another department, and to enforce that control through the removal power.

We believe that courts could well decide, however, that the President's delegation powers do not extend so far because some "specific things must be done by the President himself." *Executive Departments*, 7 Op. Att'y Gen. at 464. Moreover, we caution that an unlawful delegation of power could present serious consequences for law enforcement in future cases. *See*, *e.g.*, *United States v. Soto-Soto*, 598 F.2d 545, 549-50 (9th Cir. 1979) (where FBI agent was not authorized by statute to search trucks at border, customs authority had not been delegated to agent, and agent conducted search to discover if truck was stolen rather than to enforce importation law, agent's warrantless search of truck was improper and evidence seized from search was inadmissible under exclusionary rule).

With regard to the President's *statutory* duties, "it is well settled that there exists in the President an inherent right of delegation." Memorandum for the Files, Office of Legal Counsel, *Re: Delegation of Presidential Functions* at ii (Sept. 1, 1955) ("1955 Memo"). As stated in *Myers v. United States*, 272 U.S. 52 (1926), "[t]he vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Id.* at 117; *see also* 3 U.S.C. § 301 (authorizing President to delegate "any function which is vested in the President by law" or "any function which [an] officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President").

Generally speaking, however, "acts performable by the President[] *as prescribed by the Constitution* are not susceptible of delegation." 1955 Memo at ii (emphasis added). As the Supreme Court has noted,

> [t]here are, undoubtedly, official acts which the Constitution and laws require to be performed by the President personally, and the performance of which may not be delegated to heads of departments, or to other officers in the executive branch of the Government.

*McElrath v. United States*, 102 U.S. 426, 436 (1880). Thus, the Executive Branch has always understood that the President may not delegate his pardon power to "another man, the Attorney General or anybody else." *Executive Departments*, 7 Op. Att'y Gen. at 464-65. Nor can the President delegate his power to appoint and remove Executive Branch officials. *See id*. at 465; 1955 Memo at 1-2 (listing "[o]rders removing Government Officials from office" among those "actions not delegable").

To be sure, "[w]hether a particular act belongs to one or the other of these classes may sometimes be very difficult to determine." *McElrath*, 102 U.S. at 436. We think it likely, however, that the President's authority to control and supervise Executive Branch officials in one Cabinet department could not be delegated to a separate Cabinet department. After all, such authority rests substantially on the President's removal power, a power that has long been understood not to be delegable. In addition, further support for our conclusion is found in our earlier opinion in which we raised doubts about the President's ability to delegate his power to issue "Directives and Memorandums to Heads of Executive Departments and Agencies." In that opinion, we stated that "[i]t is certainly questionable whether any one [sic] but the President personally could issue such a directive." 1955 Memo at *65-66. Likewise, we have opined that, where "the head of a department or agency is authorized to take [a particular action] by law but . . . does not wish to take the action . . . without the President's approval or advice[,] the situation is one that normally calls for the personal attention of the President" and is therefore nondelegable. *Id*. at *67.* We see no meaningful difference between these presidential authorities and the supervisory power over executive departments sought to be delegated in the present circumstance.

## III.

We believe that there are other ways, however, for the President to take steps to centralize and coordinate the border control policy of the United States or to direct

---

* Editor's Note: We refer here to star pages in the 1955 Memo because the original memo preserved in our day books is missing some pages at the end. The star pages that we cite in text are from a digitized copy that we used to replace the missing pages in our day books.

It should be noted that the 1955 Memo does not appear to have been a formal opinion or advice issued to a client but an internal reference. The Memo was also equivocal in its bottom-line assessment of whether the head of a department could actually delegate a statutory authority to the President. The question, the Memo said, was "too indefinite in nature to permit any conclusion to be made." *Id*.

the Attorney General to lead that effort. That the President's constitutional authority to supervise all Executive Branch agencies engaged in border control operations is probably not subject to delegation does not necessarily mean that the President may not formally and publicly designate certain Cabinet officers to assist him in that effort.

The President may tap advisers within the White House or even outside the Executive Office of the President to work on his behalf. *See* Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 2 (Aug. 11, 1977) ("1977 Memo") (unlike "heads of departments or agencies," who "have statutory obligations" and "can and do act independently" of the President, the "sole function" of certain White House advisers "is to advise the President relative to his statutory and constitutional responsibilities," and such advisers only "act at the direction of the President"). Although they carry no formal legal authority, in practice such advisers may exercise substantial authority over Executive Branch officials if it is well understood that they speak on behalf of the President. *Cf. Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 905 (D.C. Cir. 1993) (recognizing "[t]he President's implicit authority to enlist his spouse in aid of the discharge of his federal duties").

The President similarly may designate Cabinet officers to advise him on his execution of nondelegable presidential duties. We have previously noted that individuals "who . . . have statutory obligations" as "heads of departments or agencies" may also be called upon to "advise the president and act at his direction." 1977 Memo at 2. *See also Am. Physicians*, 997 F.2d at 908 (noting that "Presidents have created advisory groups composed of . . . Government officials . . . to meet periodically and advise them . . . on matters such as the conduct of a war").

Thus, the President may designate the Attorney General to serve as his chief adviser on issues relating to border control and instruct all other departments that the Attorney General speaks for him with respect to such policies. To be sure, the Attorney General could not exercise any nondelegable, presidential *legal* power over such agencies. For example, an official of that agency would not be subject to removal by the Attorney General. But the President could inform the heads of relevant agencies that he has directed the Attorney General to coordinate the implementation of specific border policies that the President has developed upon the advice of the Attorney General.

There is precedent for formalizing such informal arrangements through the issuance of an executive order. Such orders make no explicit delegations of legal power, but instead implicitly announce allocations of authority by designating a particular Cabinet official as a presidential adviser or leader and coordinator of presidential policy. Executive Order 12250 of November 2, 1980, styled "Leadership and Coordination of Nondiscrimination Laws," delegated certain statutory

presidential powers to the Attorney General. *Id.* § 1-1. But the Order also directed the Attorney General to "coordinate the implementation and enforcement by Executive agencies of various nondiscrimination provisions" contained in federal law, in order to further the President's policy of "consistent and effective implementation of various laws prohibiting discriminatory practices in Federal programs and programs receiving Federal Financial assistance." *Id.* § 1-201, pmbl. The Order further directed all agencies to cooperate with the Attorney General and to issue only regulations that are "consistent with the requirements prescribed by the Attorney General pursuant to this Order" to the extent permitted by law. *Id.* § 1-402.

Another model is Executive Order 13228 of October 8, 2001, which established the Office of Homeland Security within the Executive Office of the President. Although that office has no statutory approval, the President directed the office to "develop and coordinate the implementation of a comprehensive national strategy to secure the United States from terrorist threats or attacks" and to "work with executive departments and agencies, State and local governments, and private entities to ensure the adequacy of the national strategy." *Id.* §§ 2, 3(a). Moreover, the order expressly states that it "does not alter the existing authorities of United States Government departments and agencies." *Id.* § 7. These orders thus merely create informal arrangements through which presidential policies are developed; they do nothing to disturb the statutory allocation of authorities amongst different agencies. *Cf. Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 63 (1981) (approving executive order authorizing Director of the Office of Management and Budget to take certain oversight actions with regard to the administrative process and noting that "[t]he order does not empower the Director . . . to displace the relevant agencies in discharging their statutory functions or in assessing and weighing the costs and benefits of proposed actions").

Accordingly, the President could issue an executive order that announces the President's intention to develop a comprehensive national strategy to control the flow of people and goods across United States borders. This order would be undertaken to protect the national security and promote enforcement of federal law. The order could state the President's intention to develop and maintain his border control policy only in close consultation with the Attorney General. The order could further require the Attorney General to lead and coordinate the effort of all federal agencies to comply with the President's evolving policy, and direct all agencies to cooperate with the Attorney General.

Such an order would not vest the Attorney General with *legal* authority to control the actions of, for example, the Customs Service. The Customs Service would still take its orders from the Secretary of the Treasury, who in turn would receive policy direction from the President, acting through the Attorney General. If the Commissioner of the Customs Service or the Treasury Secretary were to refuse to carry out a specific directive from the Attorney General, the Attorney General

would have no authority to remove them or otherwise compel their acquiescence. At the same time, however, they would be contravening a presidential order and could be subject to presidential removal or other sanction. We believe that if the Commissioner or the Treasury Secretary disagreed with a policy communication from the Attorney General, the more likely course of action would be to appeal to the President to seek a clarification or modification of policy.

Finally, we note the existence of certain statutory authorities for improving coordination between border control agencies which the order might direct the Attorney General to utilize. For example, under 8 U.S.C. § 1103(a)(6), the Attorney General may, with the consent of the head of another department, use an employee of that department to assist in performing the border control functions of the INS. The order thus could direct certain agencies to consent to such an arrangement. Similarly, 14 U.S.C. § 141 authorizes the Coast Guard both to lend its services and facilities to other agencies, and to avail itself of the resources of other agencies. The order might direct such cooperation between the Coast Guard and the Attorney General. We are not aware of any such authorities with respect to the Customs Service, however.

JOHN C. YOO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*