660 F.2d 61
 REX, Calvin
v.
CIA. PERVANA DE VAPORES, S. A.
Appeal of Calvin REX and Cia. Pervana De Vapores, S. A., in
No. 80-2335.
REX, Calvin
v.
CIA. PERVANA DE VAPORES, S. A.
Appeal of UNITED STATES of America, Intervenor, in No. 80-2336.
 Nos. 80-2335, 80-2336.
 United States Court of Appeals,
Third Circuit.
 Argued June 8, 1981.
Decided Sept. 17, 1981.
Rehearing and Rehearing In Banc Denied Oct. 22, 1981.
 
 E. Alfred Smith (argued), H. Wallace Roberts, Peter Hansen Bach, Krusen, Evans & Byrne, Philadelphia, Pa., for appellant Cia. Pervana De Vapores, S. A.
 Alice Daniel, Asst. Atty. Gen., Washington, D. C., Peter F. Vaira, U. S. Atty., Philadelphia, Pa., Bruno A. Ristau, Eloise E. Davies (argued), Dept. of Justice, Washington, D. C., for appellant United States of America.
 Charles Sovel (argued), Freedman & Lorry, Philadelphia, Pa., for appellee.
 Before ALDISERT, WEIS and SLOVITER, Circuit Judges.
 ALDISERT, Circuit Judge.
 
 
 1
 Before us is an interlocutory appeal certified under 28 U.S.C. § 1292(b) from a district court decision granting plaintiff-appellee's motion for a jury trial. Rex v. Cia. Pervana De Vapores, S.A., 493 F.Supp. 459 (E.D.Pa.1980). The issues certified and accepted for our review are whether all actions brought under 28 U.S.C. § 1330(a), enacted as § 2(a) of the Foreign Sovereign Immunities Act of 1976, Pub.L.No.94-583, 90 Stat. 2891 (hereinafter referred to as FSIA), must be tried to the court without a jury, whether that act is the sole basis for federal subject matter jurisdiction in civil actions against agencies or instrumentalities of foreign sovereigns, and, if the answers to both of these questions are affirmative, whether the FSIA is consistent with the seventh amendment guarantee of civil jury trial. We resolve each of the questions in the affirmative, and therefore reverse.
 
 I.
 
 2
 Because of the procedural status of the case, a detailed recitation of facts is unnecessary. Calvin Rex, the appellee, is a longshoreman who was injured while unloading cargo for the ship of the appellant, Compania Pervana De Vapores, S.A. The appellant is a Peruvian corporation, the stock of which is wholly owned by the Government of Peru. Appellee filed suit for damages under § 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), alleging federal subject matter jurisdiction by reason of diversity of citizenship, 28 U.S.C. § 1332, a federal question, 28 U.S.C. § 1331, and an action against a foreign sovereign, 28 U.S.C. § 1330(a). Included in his claim for relief was a request for a jury trial. The district court instructed the clerk to notify the Attorney General of the United States to allow his participation in the case.
 
 
 3
 In Rex v. Cia. Pervana De Vapores, S.A., 493 F.Supp. 459 (E.D.Pa.1980), the district court granted the demand for a jury trial. The court expressed concern that an interpretation of the FSIA, which creates federal jurisdiction over agents or instrumentalities of foreign states, as the exclusive basis for federal jurisdiction over foreign governments would unconstitutionally deprive plaintiffs of their right to jury trial. Section 1330(a), the jurisdictional provision of the FSIA, states:
 
 
 4
 The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.
 
 
 5
 To avoid this possible constitutional infirmity, the court concluded that 28 U.S.C. §§ 1331 and 1332 provide federal civil actions against the commercial enterprises of foreign sovereigns, and that the right to jury trial has not been eliminated from these sections. 493 F.Supp. at 466-69. By refusing to construe § 1330(a) as the exclusive basis of federal jurisdiction, therefore, the district court obviated application of the seventh amendment to invalidate the statute.[1]
 
 II.
 
 6
 The issues before us in this case have previously drawn the attention of two other courts of appeals. In Williams v. The Shipping Corp. of India, 653 F.2d 875 (4th Cir. 1981), and in Ruggiero v. Compania Pervana de Vapores "Inca Capac Yupanqui", 639 F.2d 872 (2d Cir. 1981), the courts affirmed district court orders striking jury demands on similar facts. Judge Friendly's opinion for the court in Ruggiero examined the relevant statutes and their legislative histories and concluded that § 1330(a) constitutes the sole basis of federal subject matter jurisdiction over a foreign sovereign or its entities. The court considered and rejected the theory posited by the district court in this case. It concluded that "(t)he (House and Senate) reports thus confirm what is patent from the statutory language Congress wished to provide a single vehicle for actions against foreign states or entities controlled by them, to wit, § 1330 and § 1441(d), its equivalent on removal, and to bar jury trial in each." 639 F.2d at 878.
 
 
 7
 Faced squarely with the seventh amendment question, the second circuit reasoned that the purpose of the seventh amendment is to preserve the right to jury trial as it existed in 1791 when the amendment became effective, and not to extend the right to new types of cases. Because the military and commercial operations of foreign governments were immune from suit until the middle of the twentieth century, the court concluded that the seventh amendment is inapplicable to these cases because no right of jury trial in similar cases existed when the seventh amendment became effective in 1791. Id. at 879. The court also analogized suits against foreign governments to suits against the United States, and noted that Congress can attach conditions to such suits as a predicate for creating federal jurisdiction over them. Id. at 880. It distinguished Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), and Pernell v. Southall Realty, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) as holding "only that when Congress enlarges domestic substantive law or alters procedure in cases governed by it, the Seventh Amendment protects the right to jury trial if the new substantive right or proceeding is analogous to a suit at common law in 1791." 639 F.2d at 881 (citations omitted).
 
 
 8
 The court in Williams followed the Ruggiero analysis, holding that sections 1330 and 1441(d) are jurisdictionally exclusive and that the jury bar is constitutional. Citing McElrath v. United States, 102 U.S. 426, 26 L.Ed. 189 (1880), and Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 7 L.Ed. 732 (1830), the court held that the seventh amendment applies only to defendants who could be sued at common law in 1791. Because the commercial vessels of foreign states were immune from suit in 1791, the action was not within the seventh amendment. We agree with the conclusions reached by the second and fourth circuits, although we arrive by a slightly different route.
 
 III.
 
 9
 In accordance with the oft-cited maxim that "(n)o court ought, unless the terms of an act (of Congress) rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution," Parsons v. Bedford, 28 U.S. (3 Pet.) at 448, we must first examine the jurisdictional provisions of the FSIA to determine if a reasonable construction of them will avoid a conflict with the seventh amendment. See also St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 778, 101 S.Ct. 2142, 2146, 68 L.Ed.2d 612 (1981); United States v. Clark, 445 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980); Califano v. Yamasaki, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979); New York City Transit Authority v. Beazer, 440 U.S. 568, 582-83 & n.22, 99 S.Ct. 1355, 1364 & n.22 (1979). This inquiry requires us to determine if Congress clearly intended to withhold jury trials in FSIA actions, and, if so, whether § 1330(a) is the exclusive jurisdictional grant in this case.
 
 A.
 
 10
 Section 1330(a) was intended to provide a comprehensive treatment of jurisdiction over actions against foreign states. H.R.Rep.No.1487, 94th Cong., 2d Sess. 14, reprinted in (1976) U.S.Code Cong. & Ad.News 6604, 6613. The parties concede that appellant is a "foreign state" for purposes of § 1330(a).[2] The parties also agree that appellant is entitled to no claim of immunity under the FSIA.[3]
 
 
 11
 Although Congress could have stated with more elegance that actions against foreign states and their instrumentalities could be litigated in federal court only to a judge sitting without a jury, we have been shown no indication that Congress intended its grant of jurisdiction over "nonjury civil action(s)" to mean anything other than a statutory denial of jury trial in these cases. See 1 J. Moore, Federal Practice P 0.66(4) at 700.179-.180 (2d ed. 1980). The parallel statute, 28 U.S.C. § 1441(d), which allows removal to federal court of actions filed against foreign sovereigns in state court, supports our interpretation of § 1330(a). Section 1441(d) allows removal, but states that "(u)pon removal the action shall be tried by the court without jury." The clear intention of the jurisdictional revisions in the FSIA was to require trial of these actions without a jury. Although the district court held that the appellant qualifies as both an "instrumentality of a foreign state" under 28 U.S.C. § 1603(a) and a "citizen" of a foreign state under 28 U.S.C. § 1332(a)(2), we conclude that the legislative history forecloses this interpretation of § 1332(a)(2).
 
 B.
 
 12
 The district court espoused a separate theory for avoiding denial of a jury trial. Although conceding that Congress eliminated diversity jurisdiction over foreign states by explicitly amending 28 U.S.C. § 1332(a)(2), the district court noted that Congress failed to amend the federal question statute, 28 U.S.C. § 1331. By failing to delete actions against foreign states from the federal question statute, it reasoned that Congress thereby allowed an alternative basis of jurisdiction in these cases, to which the right to jury trial would apply. The court concluded that this action arose under the LHWCA, thus creating federal question jurisdiction.
 
 
 13
 We are unable to agree with this analysis. We have recently rejected this argument in the context of the Seaman's Wage Act, 46 U.S.C. §§ 596-97. Velidor v. L/P/G Benghazi, 653 F.2d 812 at 818 & n.9 (3d Cir. 1981) (citing Ruggiero ). Although Congress did not explicitly alter § 1331, that does not end the inquiry. Appellee's argument would allow jury trials in cases presenting federal statutory or constitutional questions against foreign states, but would not allow jury trials in actions involving the same parties that were previously cognizable under the federal diversity of citizenship statute, 28 U.S.C. § 1332. We find no justification in the legislative history for treating these types of cases differently. The House Report's discussion of the amendment to § 1332, which formerly created diversity jurisdiction in these actions, states: "Since jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous." H.R.Rep.No.1487 at 14, (1976) U.S.Code Cong. & Ad.News at 6613. In addition, the legislative history of the FSIA discloses a clear intention to withhold jury trial in all actions against foreign states: "As in suits against the U.S. Government, jury trials are excluded. See 28 U.S.C. (s) 2402. Actions tried by a court without jury will tend to promote a uniformity in decision where foreign governments are involved." Id. at 13, (1976) U.S.Code Cong. & Ad.News at 6611-12; see also 1 J. Moore, Federal Practice P 0.66(4) at 700.179-.180 (2d ed. 1980). We conclude, therefore, that Congress intended all actions against foreign states to be tried without a jury, and to be brought under 28 U.S.C. § 1330(a).
 
 IV.
 
 14
 Our resolution of the statutory issues thus requires us to confront squarely the seventh amendment issue. The intention of Congress to withhold jury trial from actions against foreign states an intention we believe to be clear conflicts with whatever right a plaintiff has to be heard by a jury in these cases. If that right is protected by the seventh amendment, then the jurisdictional provisions of the FSIA must be held void as repugnant to the Constitution.
 
 
 15
 In any case in which a federal court considers the constitutionality of an act of Congress, it must be cautious to respect the "presumption of constitutionality" that is afforded acts of a coordinate branch of government. The Court has recently stated:
 
 
 16
 Whenever called upon to judge the constitutionality of an Act of Congress "the gravest and most delicate duty that this Court is called upon to perform," Blodgett v. Holden, 275 U.S. 142, 148 (48 S.Ct. 105, 107, 75 L.Ed. 206) (1927) (Holmes, J.) the Court accords "great weight to the decisions of Congress." CBS, Inc. v. Democratic National Committee, 412 U.S. 94, 102 (93 S.Ct. 2080, 2086, 36 L.Ed.2d 772) (1973). The Congress is a coequal branch of government whose members take the same oath we do to uphold the Constitution of the United States. As Justice Frankfurter noted in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 164 (71 S.Ct. 624, 644, 95 L.Ed. 817) (1951) (concurring opinion), we must have "due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government."
 
 
 17
 Rostker v. Goldberg, --- U.S. ----, ----, 101 S.Ct. 2646, 2650, 69 L.Ed.2d 478 (1981); see also City of Rome v. United States, 446 U.S. 156, 207, 100 S.Ct. 1548, 1577, 64 L.Ed.2d 119 (1980) (Rehnquist, J., dissenting). The importance of the congressional decisions reflected in the FSIA to the nation's foreign policy also counsel against invalidation of the statute without a most persuasive demonstration of unconstitutionality. The seventh amendment issue presented by this case therefore must be considered in the context in which it arises: a congressional schema comprehensively dealing with actions in American courts against foreign sovereigns.
 
 A.
 
 18
 We must first ascertain the meaning of the seventh amendment text with the judicial gloss it has received from numerous Supreme Court decisions since its ratification on December 15, 1791. The seventh amendment states in relevant part: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." U.S.Const. amend. VII. Justice Story's opinion for the Court in Parsons v. Bedford provides an early explication of the amendment that has been followed for over 150 years:
 
 
 19
 The phrase "common law," found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence.... It is well known, that in civil causes, in Courts of equity and admiralty, juries do not intervene, and that Courts of equity use the trial by jury only in extraordinary cases to inform the conscience of the Court. When, therefore, we find that the amendment requires that the right of trial by jury shall be preserved in suits at common law, the natural conclusion is, that this distinction was present to the minds of the framers of the amendment. By common law, they meant what the constitution denominated in the third article "law;" not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity was often found in the same suit.
 
 
 20
 28 U.S. (3 Pet.) 433, 446-47, 7 L.Ed. 732 (1830).
 
 
 21
 Appellant argues, and the second and fourth circuits agree, that the seventh amendment protects only actions recognized at common law in 1791. We do not accept this static approach to a vital constitutional guarantee. We have recently noted that
 
 
 22
 the Court has never relied on this static view of history to confine the seventh amendment guarantee to causes of action recognized by the common law of 1791. Beginning with an 1830 decision, Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 446-47, 7 L.Ed. 732 (1830), the Court has held the guarantee applicable to almost any suit, including a suit based on a statutorily created cause of action, that falls within the federal courts' jurisdiction over suits at law as opposed to suits in equity or admiralty. See Curtis v. Loether, 415 U.S. 189, 193-94, 94 S.Ct. 1005, 1007-08, 39 L.Ed.2d 260 (1974).
 
 
 23
 In re Japanese Electronic Products Antitrust Litigation, 631 F.2d 1069, 1078 (3d Cir. 1980). We must decide whether Rex's claim is a "Suit at common law," but we do not view common law as frozen in 1791.
 
 
 24
 Appellee stresses two recent Supreme Court decisions in particular as indicating that he has a right to a jury trial that the FSIA cannot abrogate. Both decisions implicated federal statutes that were silent on the question of trial by jury. In Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the Court unanimously held that the defendant in a fair housing action brought to redress alleged violations of Title VIII has a right to jury trial protected under the seventh amendment. After quoting Parsons v. Bedford, the Court explained: "The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." 415 U.S. at 194, 94 S.Ct. at 1008.
 
 
 25
 In Pernell v. Southall Realty, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), the Court held that the seventh amendment protects the right to jury trial in actions for the recovery of property in the District of Columbia. The Court first considered that no reasonable construction of the statute at issue supported a right to jury trial, and then addressed the seventh amendment question, stating:
 
 
 26
 Whether or not a close equivalent to (D.C.Code) § 16-1501 existed in England in 1791 is irrelevant for Seventh Amendment purposes, for that Amendment requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty. See Curtis v. Loether, supra (415 U.S.] at 195, (94 S.Ct. at 1008).
 
 
 27
 416 U.S. at 375, 94 S.Ct. at 1729. The Court subsequently examined the common law status of actions to recover possession of realty, and concluded that the actions sounded in common law; i. e., they were legal, not equitable. Id. at 375-82, 94 S.Ct. at 1729-1733.
 
 B.
 
 28
 Appellee emphasizes that the legal-equitable distinction is crucial in resolving this case. Because damages is a legal remedy, see, e. g., Atlas Roofing Co. v. OSHRC, 430 U.S. 442, 449, 97 S.Ct. 1261, 1266, 51 L.Ed.2d 464 (1977); Ross v. Bernhard, 396 U.S. 531, 542-43, 90 S.Ct. 733, 740-741, 24 L.Ed.2d 729 (1970), he concludes that the seventh amendment applies to this case and a jury trial is necessary. We are not persuaded by this argument. A plaintiff's demand for damages does not in itself convert his action into a suit at common law within the meaning of the amendment.
 
 
 29
 In Galloway v. United States, 319 U.S. 372, 388-89, 63 S.Ct. 1077, 1086-1087, 87 L.Ed. 1458 (1943) (footnotes omitted), the Court stated:
 
 
 30
 The suit is one to enforce a monetary claim against the United States. It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign. Whatever force the Amendment has therefore is derived because Congress, in the legislation cited, has made it applicable.
 
 
 31
 This term, in Lehman v. Nakshian, --- U.S. ----, ----, 101 S.Ct. 2698, 2702 n.9, 69 L.Ed.2d 548 (1981), the Court reaffirmed Galloway and explained:
 
 
 32
 The reason that the Seventh Amendment presumption in favor of jury trials does not apply in actions at law against the United States is that the United States is immune from suit, and the Seventh Amendment right to a jury trial, therefore, never existed with respect to a suit against the United States. Since there is no generally applicable jury trial right that attaches when the United States consents to suit, the accepted principles of sovereign immunity require that a jury trial right be clearly provided in the legislation creating the cause of action.
 
 
 33
 Even the dissenting justices in Lehman accepted this reaffirmation of Galloway. See id. at --- no.2, 101 S.Ct. at 2707 n.2 (Brennan, J., dissenting). See also Glidden Co. v. Zdanok, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962) (plurality opinion); United States v. Sherwood, 312 U.S. 584, 587, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941); McElrath v. United States, 102 U.S. 426, 440, 26 L.Ed. 189 (1880). Thus, the proper inquiry is not whether a plaintiff seeks money damages, but whether his action is in the nature of a legal remedy similar to a suit at common law. To answer this question, we must examine the law relating to private actions against foreign sovereigns.
 
 V.
 
 34
 The Supreme Court announced the doctrine of absolute jurisdictional immunity for foreign sovereigns in The Schooner Exchange v. McFadden, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), a polestar of both American and international law. American citizens attached a French warship in Philadelphia, claiming she had been unlawfully seized from their custody by persons acting under orders of the Emperor Napoleon. The United States Attorney for the District of Pennsylvania appeared and filed a suggestion that the attachment be quashed and the libel dismissed, and the Attorney General argued the same position before the Supreme Court. Chief Justice Marshall's opinion for a unanimous Court examined principles of international law and concluded that "national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction." Id. at 145-46. The Court recognized that "the sovereign of the place is capable of destroying this implication," for example, by explicitly subjecting such vessels to the jurisdiction of its courts, but held that it must exert that power "in a manner not to be misunderstood." Id. at 146. The Court thereafter extended jurisdictional protection to commercial ships owned by foreign states in Berizzi Brothers Co. v. S.S. Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926), resting its decision on "the absolute independence of every sovereign authority, and ... the international comity which induces every sovereign state to respect the independence and dignity of every other sovereign state." Id. at 575, 46 S.Ct. at 613 (quoting The Parlement Belge, 5 P.D. 197, 217, (1874-80) All E.R. 104, ____, (C.A.1880)).
 
 
 35
 The first crack in the wall of absolute immunity was not caused by Congress, but appeared in Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945). The Court noted the practice of the federal courts, followed since The Schooner Exchange, of recognizing claims of immunity registered by foreign governments and recognized "by the political branch of the government charged with the conduct of foreign affairs." Id. at 34, 65 S.Ct. at 532. The guiding principle, said the Court, is that "the courts should not so act as to embarrass the executive arm in its conduct of foreign affairs." Id. at 35, 65 S.Ct. at 532. It concluded that "(i)t is ... not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." Id. Because the State Department had explicitly declined to recognize Mexico's claim of immunity, the Court denied the claim, finding
 
 
 36
 that it is the national policy not to extend the immunity in the manner now suggested, and that it is the duty of the courts, in a matter so intimately associated with our foreign policy and which may profoundly affect it, not to enlarge an immunity to an extent which the government, although often asked, has not seen fit to recognize.
 
 
 37
 Id. at 38, 65 S.Ct. at 534.
 
 
 38
 The State Department in 1952 announced that in the consideration of requests from foreign governments it would adhere to the "restrictive theory of sovereign immunity," which recognizes immunity "with regard to sovereign or public acts (jure imperii ) of a state, but not with respect to private acts (jure gestionis )." 26 Dept. State Bull. 984 (1952) (the "Tate letter").[4] The federal courts have expressed dissatisfaction with this distinction, but they have nevertheless uniformly followed it in the absence of an executive recognition of a specific claim of immunity. E. g., Victory Transport, Inc. v. Comisaria General, 336 F.2d 354 (2d Cir. 1964), cert. denied, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). More important, the courts have continued to recognize claims certified by the State Department, without further inquiry. E. g., Spacil v. Crowe, 489 F.2d 614 (5th Cir. 1974); Isbrandtsen Tankers, Inc. v. President of India, 446 F.2d 1198 (2d Cir.) cert. denied, 404 U.S. 985, 92 S.Ct. 452, 30 L.Ed.2d 369 (1971); Rich v. Naviera Vacuba, S.A., 295 F.2d 24 (4th Cir. 1961).
 
 
 39
 History thus conclusively demonstrates that actions against foreign sovereigns have never existed at common law. The right of action has existed always and exclusively at the sufferance of the United States Department of State. For compelling reasons of national policy, our courts have from the earliest cases uniformly recognized and complied with the discretionary determinations of the executive branch. The law of liability of foreign sovereigns is, as the second circuit concluded, sui generis. Ruggiero, 639 F.2d at 881. We regard it as a unique species of public law, drawing deeply on its origins in admiralty and international law, peculiar only in its characteristic of absolute judicial fealty to executive decisionmaking.[5]
 
 
 40
 In 1973 and again in 1975 the Departments of State and Justice recommended to the Congress that it enact legislation codifying the restrictive theory and entrusting the resolution of questions of sovereign immunity to the judiciary. See H.R.Rep.No.1487 at 6-7, 44-46, (1976) U.S.Code Cong. & Ad.News at 6604-06, 6634-35. Congress complied in 1976 by enacting the FSIA. We now consider the effect of codification on the common law status of these actions.
 
 VI.
 
 41
 In enacting the Foreign Sovereign Immunities Act, Congress, upon the recommendation of the executive branch, transferred an important aspect of our foreign policy to the judiciary. See id.; Sugarman v. Aeromexico, Inc., 626 F.2d 270, 275 (3d Cir. 1980). In doing so, it expressed its intent that foreign sovereigns not be subjected to the jury system. This determination certainly does not reflect a distrust of the jury system by Congress. More probably it discloses a fear by Congress that foreign states, operating under the civil law tradition and not Anglo-American common law, and having little or no exposure to the jury system in civil cases, will question its wisdom and objectivity. See Ruggiero, 639 F.2d at 880 n.12; Aldisert, The Nature of the Judicial Process: Revisited, 49 Univ. of Cin.L.Rev. 1, 8-16 (1980). Significantly, Congress has refused to subject the United States to trial by jury, 28 U.S.C. §§ 1346(a)(2), 2402, and the Supreme Court has consistently upheld this refusal, see, e. g., Lehman v. Nakshian, --- U.S. ----, ----, 101 S.Ct. 2698, 2700-2701, 69 L.Ed.2d 548 (1981). The FSIA contains other instances in which Congress extended special procedures applicable to the United States to foreign states. See 28 U.S.C. § 1608(d), (e); H.R.Rep.No.1487 at 25-26, (1976) U.S.Code Cong. & Ad.News at 6624-25. To enhance the likelihood that foreign states will cooperate with the American judicial process, therefore, Congress limited the right to jury trial.
 
 
 42
 We are also persuaded that this qualification on the remedies available against foreign states was central to the congressional decision to create, for the first time, special federal jurisdiction over foreign states, and we do not doubt congressional authority to limit the jurisdiction of the federal courts to consider these claims. See Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); see also J. Choper, Judicial Review and the National Political Process 380-415 (1980) (discussing "Political Regulation of Judicial Authority"). To hold that Congress could remove these cases from the federal judiciary, but could not effectuate a valid and legitimate foreign policy concern by taking the less radical step of limiting judicial access to nonjury proceedings would pose a Hobson's choice for Congress and ultimately work to the detriment of injured plaintiffs.
 
 
 43
 Therefore, we cannot conclude that by codification Congress has created a cause of action in the nature of a common law remedy. Congress explicitly determined, upon the recommendation of the executive branch and for reasons of policy similar to those that have counselled past judicial deference to the executive, that no jury should intervene in an action under the FSIA. Inasmuch as the FSIA does not codify a pre-existing cause of action at common law, that determination does not offend the seventh amendment. Compare Curtis v. Loether, 415 U.S. at 195, 94 S.Ct. at 1008 (the seventh amendment applies to statutory rights of action "where there is obviously no functional justification for denying the jury trial right ... (and) if the action involves rights and remedies of the sort typically enforced in an action at law").
 
 
 44
 We hold, therefore, that a suit against a foreign sovereign in district court pursuant to the FSIA is not a suit at common law within the meaning of the seventh amendment, and therefore that the denial of jury trial in the Act does not violate the Constitution.
 
 VII.
 
 45
 Accordingly, consistent with the two other courts of appeals which have considered this specific issue, we will reverse the judgment of the district court granting appellee's motion for jury trial and remand the cause for further proceedings consistent with the foregoing.
 
 
 46
 SLOVITER, Circuit Judge, dissenting.
 
 
 47
 I agree with the majority's conclusion that when the Foreign Sovereign Immunities Act is fairly read, it must be construed as providing the sole basis of federal jurisdiction in actions against foreign states and their instrumentalities, as defined in the statute. Therefore, I agree that we cannot avoid the constitutional issue presented by the elimination of the right to jury trial in actions against corporations which are conducting the commercial enterprises of foreign states.
 
 
 48
 I dissent from the holding of the majority that a suit for damages against a corporation owned by a foreign state is not a suit "at common law" within the meaning of the Seventh Amendment. I believe that the majority deviates from the relevant precedent when it looks to the nature of the defendant rather than to the nature of plaintiff's claim or rights. Further, I believe that the right to jury trial preserved by the Seventh Amendment may not be extinguished by Congress' action in defining a "foreign state" to automatically include a corporation whose stock is owned by a foreign government. Accordingly, I would hold that the Foreign Sovereign Immunities Act is unconstitutional insofar as it denies plaintiff a jury trial merely because the defendant is a corporation in which a foreign state owns a controlling interest.
 
 I.
 
 49
 Any analysis of the scope of the Seventh Amendment must begin with two guidelines enunciated by the Supreme Court in Pernell v. Southall Realty, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974). The Court there focused on the Seventh Amendment's reference to suits "at common law" and stated that (1) "the right extends beyond the common-law forms of action recognized (in 1791)", id. at 374, 94 S.Ct. at 1729 (quoting Curtis v. Loether, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974)) and (2) "(the Seventh) Amendment requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty." Id. at 375, 94 S.Ct. at 1729 (emphasis added).
 
 
 50
 The majority's acknowledgement that the Seventh Amendment does not view common law as frozen in 1791 is mandated by the applicable precedent. See Pernell v. Southall Realty, 416 U.S. at 374-75, 94 S.Ct. at 1729; Curtis v. Loether, 415 U.S. at 193-95, 94 S.Ct. at 1007-1008; Ross v. Bernhard, 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed.2d 729 (1970); Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 446-47, 7 L.Ed. 732 (1830); In re Japanese Electronic Products Antitrust Litigation, 631 F.2d 1069, 1078 (3d Cir. 1980). The relevant inquiry is whether the "rights and remedies" at issue are "of the sort" enforced at common law. Plaintiff in the present case is a United States citizen who seeks to recover tort damages for personal injuries he sustained as a longshoreman on a vessel owned by defendant while the ship was moored at a pier in Philadelphia. One cannot reasonably view the remedy sought as anything other than a traditional common law remedy. As the Court stated in Curtis v. Loether, 415 U.S. at 196, 94 S.Ct. at 1009, "the relief sought here actual and punitive damages is the traditional form of relief offered in the courts of law."
 
 
 51
 The majority has jumped, without fully articulating why, from the question of the nature of the legal remedy sought to the question of the amenability of foreign sovereigns to suit at common law. The majority appears to have reframed the relevant question into whether there was a "right" to sue a foreign sovereign at common law. Since the majority concludes from The Schooner Exchange v. McFadden, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), and its progeny that there was no such right, it follows for the majority that there is no Seventh Amendment protection for the suit in question. In its route to this conclusion, the majority leapfrogs over pertinent factual, legal and historical distinctions, which, for me, impair the logic of both its analysis and conclusion.
 
 
 52
 Central to the majority's focus on the nature of the defendant are the Supreme Court cases holding that suits against the United States, even when they are for monetary damages, do not require jury trials. See Lehman v. Nakshian, --- U.S. ----, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981); Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943). The majority analogizes the sovereign immunity of the United States to the immunity accorded to foreign sovereigns, and reasons that if the Seventh Amendment does not compel jury trials in suits against the former, it follows that it does not compel jury trials in suits against the latter. At 66. The analogy is inapt.
 
 
 53
 The sovereign immunity of the United States has been attributed to a variety of constitutional, historical, and metaphysical principles. Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 388, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939). Cf. Monaco v. Mississippi, 292 U.S. 313, 321, 54 S.Ct. 745, 747, 78 L.Ed. 1282 (1934) (sovereign immunity implicit in constitutional plan); Williams v. United States, 289 U.S. 553, 573, 53 S.Ct. 751, 757, 77 L.Ed. 1372 (1933) (same); Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907) ("(T)here can be no legal right as against the authority that makes the law on which the right depends.") It may inhere in the separation of powers under which we conduct our affairs. Whatever its theoretical basis, since the United States as sovereign cannot be sued in its own courts without its consent,[1] it follows that it may attach conditions to its consent to be sued, and that one of the conditions can be the elimination of trial by jury. See Glidden Co. v. Zdanok, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671 (1962); United States v. Sherwood, 312 U.S. 584, 587, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941).
 
 
 54
 In contrast, the sovereign immunity of foreign states has no constitutional underpinning. National City Bank v. Republic of China, 348 U.S. 356, 359, 75 S.Ct. 423, 426, 99 L.Ed. 389 (1955); Wacker v. Bisson, 348 F.2d 602, 609 (5th Cir. 1965). Foreign sovereign immunity stems from notions of comity and expediency in the conduct of foreign affairs. See First National Bank v. Banco Nacional City de Cuba, 406 U.S. 759, 762, 92 S.Ct. 1808, 1810, 32 L.Ed.2d 466 (1972) (plurality opinion).[2] The limits of the doctrine of foreign sovereign immunity were expressly noted by Justice Story in The Santissima Trinidad & The St. Andre, 20 U.S. (7 Wheat.) 283, 352-53, 5 L.Ed. 454 (1822):
 
 
 55
 In the case of The Exchange (7 Cranch 116, 3 L.Ed. 287), the grounds of the exemption of public ships were fully discussed and expounded. It was there shown, that it was not founded upon any notion that a foreign sovereign had an absolute right, in virtue of his sovereignty, to an exemption of his property from the local jurisdiction of another sovereign, when it came within his territory; for that would be to give him sovereign power beyond the limits of his own empire. But it stands upon principles of public comity and convenience, and arises from the presumed consent or license of nations, that foreign public ships coming into their ports, and demeaning themselves according to law, and in a friendly manner, shall be exempt from the local jurisdiction. But as such consent and license is implied only from the general usage of nations, it may be withdrawn upon notice, at any time, without just offence, and if afterwards such public ships come into our ports, they are amenable to our laws, in the same manner as other vessels. (Emphasis supplied)Therefore, I believe the majority errs in assuming that the immunity of foreign states rests on the same basis as that of the United States. Since the analogy itself is misconceived, it cannot persuasively justify elimination of jury trials when a foreign sovereign is sued.
 
 II.
 
 56
 It is not now necessary for us to decide the extent of Seventh Amendment applicability when suit is against a foreign sovereign for official actions taken in its governmental capacity. No such issue is presented because the FSIA provides immunity from suit in such instances. 28 U.S.C. § 1604. It is important, however, that we recognize that there has been a distinction historically observed between the foreign sovereign itself and its ownership interests.
 
 
 57
 Enterprises such as the defendant in the present case, a corporation wholly owned by the government of Peru, did not exist at the time the Seventh Amendment was adopted.[3] When foreign state-owned corporations began to be formed, they were not accorded presumptive immunity from suit. More often than not, such corporations were amenable to suit and in no case was ownership determinative. Indeed, it seems that courts have uniformly declined to give decisive weight to the mere fact of ownership. In Coale v. Societe Co-operative Suisse des Charbons, 21 F.2d 180 (S.D.N.Y.1921), the defendant was a Swiss corporation organized for the purpose of importing and distributing coal. The Swiss government appointed seven of the seventeen directors, reserved the right to approve the by-laws, and was entitled to all net profits above 6 per cent. Plaintiff sued for breach of a sales contract signed for the defendant by the Swiss Finance Minister. In dismissing defendant's claim of immunity, Judge Augustus Hand stated that "if the Swiss government chose to do its business by means of the Societe, the latter, as a corporate entity, was liable for its corporate obligations. I find no case which holds otherwise." Id. at 181.
 
 
 58
 Similarly, in United States v. Deutsches Kalisyndikat Gesellschaft, 31 F.2d 199 (S.D.N.Y.1929), the court rejected the defense of sovereign immunity where defendant was a corporation owned and controlled by France engaged in mining potash: "A suit against a corporation is not a suit against a government merely because it has been incorporated by direction of the government, and is used as a governmental agent, and its stock is owned solely by the government." Id. at 202. This same reasoning has led numerous other courts to reject claims of immunity interposed by corporate defendants. See, e. g., Hannes v. Kingdom of Roumania Monopolies Institute, 260 App.Div. 189, 198, 20 N.Y.S.2d 825, 833-34 (1940); Ulen & Co. v. Bank Gospodarstwa Krajowego, 261 App.Div. 1, 7, 24 N.Y.S.2d 201, 206 (1940); The Uxmal, 40 F.Supp. 258, 261 (D.Mass.1941); S. T. Tringali Co., Inc. v. The Tug Pemex XV, 274 F.Supp. 227, 230 (S.D.Tex.1967). Cf. Mexico v. Hoffman, 324 U.S. 30, 35 n. 1, 36-37, 65 S.Ct. 530, 532, 533 n. 1, 89 L.Ed. 729 (1945) (state ownership of merchant vessel does not, by itself, entitle vessel to immunity); The Beaton Park, 65 F.Supp. 211, 212-13 (D.D.C.1946) (same).
 
 
 59
 Even where the court ultimately recognized a claim of immunity, recognition was not based upon state ownership alone. For example, in In re Investigation of World Arrangements, 13 F.R.D. 280, 290 (D.D.C.1952), the court, although holding that the Anglo-Iranian Oil Company was immune, stated that "in determining whether or not a given corporation is an instrumentality of its government it is not material whether the government owns all the stock." The court defined the real question as "whether the corporate entity ... is of such a character as to be recognized as a unit of the ... Government." Id. No case cited by appellant or the United States, which has intervened, undercuts or seriously challenges the line of authority set out above.[4] Thus the relevant case law demonstrates that corporations such as the defendant in this case were subject to suit prior to the FSIA. The majority's reliance on the immunity from suit of the foreign state itself is not to the contrary but is, rather, simply irrelevant.
 
 
 60
 Another reason to reject the majority's automatic identification of the foreign state with commercial corporations in which the foreign state has an interest is the distinction observed at common law between the United States and the commercial corporations in which it had an interest. There is a consistent line of authority in the Supreme Court, the lower federal courts, and state courts holding that the attributes of sovereignty, including immunity, are not conferred upon a corporation by the mere fact of governmental ownership. See, e. g., Bank of the United States v. Planters' Bank of Georgia, 22 U.S. (9 Wheat.) 904, 906, 6 L.Ed. 244 (1824); United States v. Strang, 254 U.S. 491, 493, 41 S.Ct. 165, 166, 65 L.Ed. 368 (1921); Sloan Shipyards Corp. v. United States Fleet Corp., 258 U.S. 549, 565, 42 S.Ct. 386, 387, 66 L.Ed. 762 (1922); Olson v. United States Spruce Production Corp., 267 U.S. 462, 463, 45 S.Ct. 357, 357, 69 L.Ed. 738 (1925); Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 388, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939); Federal Sugar Refining Co. v. United States Sugar Equalization Board, Inc., 268 F. 575, 585 (S.D.N.Y.1920); Panama R. Co. v. Minnix, 282 F. 47, 49, 50 (5th Cir. 1922); Cox v. Lykes Brothers, 237 N.Y. 376, 382-83, 143 N.E. 226, 228 (1924).[5] See also Thurston, Government Proprietary Corporations, 21 Va.L.Rev. 351, 372, 377 n. 67 (collecting cases), 379 n. 73 (collecting cases) (1935). As Chief Justice Marshall explained,
 
 
 61
 The suit is against the corporation, and the judgment is to be satisfied by the property of the corporation, not by that of the individual incorporators. The state does not, by becoming a corporator (sic), identify itself with the corporation.
 
 
 62
 Bank of the United States v. Planters' Bank of Georgia, 22 U.S. at 906. He continued,
 
 
 63
 The government of the Union held shares in the old Bank of the United States; but the privileges of the government were not imparted by that circumstance to the Bank.
 
 
 64
 Id. at 908.
 
 
 65
 The thread running through these cases, as with those dealing with foreign state-owned corporations, is that ownership itself raises no presumption of immunity. It followed that when plaintiffs could sue such defendants, they were accorded jury trials despite the sovereign character of the owner of the defendant corporation.[6] Legette v. National Railroad Passenger Corp., 478 F.Supp. 1069 (E.D.Pa.1979) (U.S.); Washington v. National Railroad Passenger Corp., 477 F.Supp. 1134 (D.D.C.1979) (U.S.); see also MacDonald v. Air Canada, 439 F.2d 1402 (1st Cir. 1971) (Canada).
 
 
 66
 Until enactment of the FSIA, the critical factor in determining whether a claim of sovereign immunity was appropriate was not mere ownership but was instead the nature of the foreign sovereign's action or activity at issue. Immunity was accorded for official actions of foreign sovereigns and denied for their commercial or proprietary activities. See Victory Transport Inc. v. Comisaria General, 336 F.2d 354, 360-62 (2d Cir. 1964), cert. denied, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). That distinction was maintained in the 1952 "Tate Letter" which formalized the State Department's adherence to the "restrictive theory" of foreign sovereign immunity. While it is of course true that immunity was extended to a merchant vessel in Berizzi Bros. Co. v. Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926), that decision was reached in the face of the State Department's position that the "merchant vessels or vessels under requisition of governments whose flag they fly employed in commerce should not be regarded as entitled to the immunities accorded public vessels of war." See Mexico v. Hoffman, 324 U.S. at 39, 65 S.Ct. at 534 (Frankfurter, J., concurring); 2 G. Hackworth, Digest of International Law 437, 444-45 (1941). The Court rested its decision on an expansive notion of what constituted sovereign acts and "public property". It may be that in the late 19th and early 20th century, when the vision of the commercial empire flourished, a court could conclude that an armed commercial fleet[7] was a necessary arm of sovereignty and so extend to it the immunity normally reserved to the state itself. It is ironic that such an outdated and discredited notion[8] should be resurrected by the majority as the basis for extinguishing the "fundamental and sacred" right to trial by jury. See Jacob v. New York City, 315 U.S. 752, 752, 62 S.Ct. 854, 854, 86 L.Ed. 1166 (1942).
 
 III.
 
 67
 To recapitulate, I believe the majority's analysis is flawed because it erroneously equates foreign and domestic sovereignty and fails to differentiate between the official and the commercial actions of the foreign sovereign.[9] I turn then to the majority's reliance on the presumption of constitutionality for legislative acts and the "importance of the congressional decisions reflected in the FSIA of the nation's foreign policy" as additional support for its conclusion that the Seventh Amendment is inapplicable to legal claims against corporations which happen to be owned in whole or in part by foreign states. See at 65. Congress has not made a policy determination that suits against foreign sovereign-owned instrumentalities engaged in commercial activities are inimical to our foreign policy interests. Quite the contrary. In the FSIA, Congress has expressly provided that commercial activities of foreign states are not immune from suit in the federal courts. The only issue is whether Congress had the power to deprive plaintiffs in such actions of their right to jury trials.
 
 
 68
 As to the presumption of constitutionality, I believe that any federal judge who determines, after independent analysis, that Congress has acted beyond the scope of its powers does so reluctantly. Nonetheless, the responsibility of the judiciary to determine when Congress has exceeded the permissible scope of its powers occupies too central a place in the success of our system of government to be avoided under the rubric of the presumption of validity of legislative actions. Unquestionably, Congress could, if it chose, limit the jurisdiction of the federal courts by excluding therefrom not only suits against foreign sovereigns for their official actions but also suits against foreign sovereign-owned instrumentalities engaged in commercial activities. But having chosen not to do so, the congressional power to control the jurisdiction of the federal courts may not be used as a justification for congressional action which denies substantive constitutional rights. See United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872); Battaglia v. General Motors Corp., 169 F.2d 254 (2d Cir. 1948), cert. denied, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948).
 
 
 69
 I, too, believe that, where possible, courts should defer to the wisdom of Congress when, acting on the advice of the executive, it enacts legislation dealing with foreign affairs. However, I am unwilling to accept the majority's relegation of the judiciary's role to one of "absolute judicial fealty to executive decisionmaking." At 68. All exercises of governmental power must be tested against the constraints imposed by the Constitution. The area of foreign affairs, however delicate, is no exception:
 
 
 70
 The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written constitution and undermine the basis of our Government. If our foreign commitments become of such nature that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the method which it prescribes.
 
 
 71
 Reid v. Covert, 354 U.S. 1, 14, 77 S.Ct. 1223, 1229, 1 L.Ed.2d 1148 (1957). See also Geisser v. United States, 513 F.2d 862 (5th Cir. 1975), on remand Petition of Geisser, 414 F.Supp. 49 (S.D.Fla.1976), vacated, Geisser v. United States, 627 F.2d 745 (5th Cir. 1980) (en banc), cert. denied, Bauer v. United States, 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981).
 
 
 72
 The constitutional issue arises in this case because Congress, in the FSIA, did more than meet what the legislative history shows were its primary concerns: to vest sovereign immunity decisions exclusively in the courts[10] and "to assure that American citizens are not deprived of normal legal redress against foreign states who engage in ordinary commercial transactions".[11] When Congress defined "foreign states" to include foreign sovereign-owned corporations engaged in commercial activities, it extended the scope of the statute beyond foreign policy considerations and collided with the fundamental interest in providing jury trials in civil cases. A growing number of foreign states have systems of government which extend state ownership to all forms of business enterprises, including airlines, steel companies, banks, and, as in this case, commercial ships. The statute as construed by the majority would deprive plaintiffs of their jury trials in a vast number of ordinary tort and contract actions against such entities. Such actions involve "rights and remedies of the sort traditionally enforced in an action at law." Pernell v. Southall Realty, 416 U.S. at 375, 94 S.Ct. at 1729. Whether Congress chose to call the defending entities "foreign states," "agencies or instrumentalities of foreign states," or "camels" cannot be determinative of plaintiff's Seventh Amendment right to jury trial. Where constitutional rights are at stake, the judiciary cannot play Polonius to Congress' Hamlet and so permit legislative lexicography to defeat those rights.[12]
 
 IV.
 
 73
 In summary, the right to jury trial in civil actions protected by the Seventh Amendment is a fundamental right which inures to federal plaintiffs when the rights and remedies they seek to enforce are of the sort traditionally enforced in an action at law. Actions for damages against corporations engaged in commercial activities which are owned in whole or in part by foreign sovereigns fall within that category. Neither the historic immunity accorded to foreign states nor the faulty analogy to the sovereign immunity of the United States can justify deprivation of a jury trial in cases against such corporations. To the extent that the FSIA deprives plaintiffs seeking damages of a jury trial in their actions against foreign sovereign-owned corporations, I believe it is unconstitutional. I also believe that provision for a nonjury trial in such cases can be severed from the remainder of the FSIA, and would therefore affirm the order of the district court refusing to strike the demand for jury trial.
 
 
 
 [1]
 The district court certified its decision for immediate appeal under § 1292(b) and urged this court to resolve this difficult problem. On August 20, 1980, a motions panel of this court granted leave to appeal. App. at 59a
 
 
 [2]
 The definitional section is 28 U.S.C. § 1603, which states:
 For purposes of this chapter
 (a) A "foreign state," except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
 (b) An "agency or instrumentality of a foreign state" means any entity
 (1) which is a separate legal person, corporate or otherwise, and
 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.
 
 
 [3]
 Exceptions to the general immunity accorded foreign governments under the FSIA appear in § 1605(a)(2), relevant portions of which state:
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case
 ....
 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
 We assume that the nature of the enterprise in this case can properly be characterized as "commercial activity carried on in the United States."
 
 
 [4]
 The Tate letter is reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 711, 96 S.Ct. 1854, 1869, 48 L.Ed.2d 301 (1976), as an Appendix to the opinion of the Court
 
 
 [5]
 Cf. Parsons v. Bedford, 28 U.S. (3 Pet.) at 447 (describing admiralty as "a mixture of public law, and of maritime law and equity")
 
 
 [1]
 There has been an inexplicable failure to relate the constitutional provision that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law....", U.S.Const. Art. I, § 9, cl. 7, to the doctrine of sovereign immunity. That provision, which conditions the United States' liability on its own consent, puts the sovereign immunity of the United States on a far different basis than either the sovereign immunity of the constituent states or of a foreign state
 
 
 [2]
 Cf. 14 W. Holdsworth, A History of English Law 59 (1964) (sovereign immunity deemed necessary "for the preservation of the honour and dignity of nations"); Reisenfield, Sovereign Immunity of Foreign Vessels in Anglo-American Law: The Evolution of a Legal Doctrine, 25 Minn.L.Rev. 1, 3 n.12 (1940) ("It is very difficult to give any more substantial rationalization for the doctrine of sovereign immunity than the reference to international comity. Stating that the exercise of jurisdiction in these cases would infringe upon the 'equality,' the 'independence,' or the 'honor' of the foreign state is hardly more than using a facon de parler.")
 
 
 [3]
 See Trendtex Trading Corp. v. Central Bank of Nigeria, (1977) W.L.R. 356, 366 (per Lord Denning); Compania Naviera Vascongado v. The Christina, (1938) A.C. 485, 521 (per Lord Maugham); Berizzi Bros. Co. v. S. S. Pesaro, 271 U.S. 562, 573, 46 S.Ct. 611, 612, 70 L.Ed. 1088 (1926); S. Sucharitkul, State Immunities and Trading Activities in International Law 19 (1950). See also Mexico v. Hoffman, 324 U.S. 30, 40-41, 65 S.Ct. 530, 535, 89 L.Ed. 729 (1945) (Frankfurter, J., concurring)
 
 
 [4]
 Mason v. Intercolonial Railway of Canada, 197 Mass. 349, 83 N.E. 876 (1908); Bradford v. Director General of Railroads of Mexico, 278 S.W. 251 (Tex.Civ.App.1925); Dunlap v. Banco Central del Ecuador, 41 N.Y.S.2d 650 (1943); United States of Mexico v. Schmuck, 293 N.Y. 264, 56 N.E.2d 577 (1944); and Stone Engineering Co. v. Petroleos Mexicanos, 352 Pa. 12, 42 A.2d 57 (1945), are cited by the United States for the proposition that corporate entities were on occasion entitled to immunity. Brief for the United States at 31 n. 15. I find most of these cases inapposite. A central factor to the holding in Mason was the fact that the railway was not a corporation and that no corporation had any interest in the railway. In Bradford, the court relied upon testimony that the railroad was not operated as a corporation, that all persons having any relationship to the operation of the railroad were "solely, exclusively and entirely employees of the Government of Mexico, and have no relation or connection with any corporate entity." 278 S.W. at 251-52. Likewise, in Schmuck, the Mexican Charge d'Affaires specifically called to the attention of the Secretary of State the fact that defendant was not a corporate entity. 56 N.E.2d at 578. The two cases which are on point, Dunlap and Stone Engineering Co., do no more than restate the accepted distinction between public or governmental functions and private or commercial undertakings. The uncontroverted proposition remains that mere state ownership did not entitle foreign corporations to the immunity granted the state itself
 
 
 [5]
 Even where property was held directly by the sovereign and not through the intermediary of a corporation, such property was not given immunity by virtue of ownership alone. See The Davis, 77 U.S. (10 Wall.) 15, 19 L.Ed. 875 (1869) (salvage lien enforceable against property of U.S. since not in actual possession of government); The Fidelity, 8 Fed.Cas. (16 Blatchf.) 1189, 1191 (C.C.N.Y.1879) ("Property does not necessarily become part of the sovereignty because it is owned by the sovereign. To make it so, it must be devoted to public use, and employed in carrying on the operations of government"); Berizzi Bros. Co. v. Pesaro, 271 U.S. at 575, 46 S.Ct. at 613 (quoting Briggs v. The Light Boats, 11 Allen 157, 165 (Mass.1865) ("Immunity ... arises ... because (the boats) are instruments of sovereignty ... (and because of) the purpose to which they are devoted")
 
 
 [6]
 Actions against United States corporations were not treated as actions against the United States which would have been cognizable only in the Court of Claims, but instead were held to be properly brought in the district courts. Sloan Shipyards Corp. v. United States Fleet Corp., 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762 (1922)
 
 
 [7]
 The merchant vessel which was the subject of the Berizzi opinion was armed. See 2 G. Hackworth, Digest of International Law 437 (1941)
 
 
 [8]
 The wisdom of the Berizzi decision was questioned by Justice Frankfurter in his concurring opinion in Mexico v. Hoffman, 324 U.S. 30, 39, 40-41, 65 S.Ct. 530, 534, 535, 89 L.Ed. 729 (1945). More recently, four members of the Court agreed that the "authority of that case (Berizzi ) has been severely diminished by later cases," Alfred Dunhill of London, Inc. v. Cuba, 425 U.S. 682, 699, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976), and that "Berizzi no longer correctly states the law." Id. at 703, 96 S.Ct. at 1865
 
 
 [9]
 I do not suggest that the distinction between an official activity and a commercial activity of a foreign state is always clear. It is, however, a line which the FSIA has already drawn, since it defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act." The act further provides that "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d)
 
 
 [10]
 H.R.Rep.No.94-1487, 94th Cong., 2d Sess. 12, reprinted in (1976) U.S.Code Cong. & Ad.News 6610; Hearings Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, House of Representatives, on H.R. 11315, 94th Cong., 2d Sess. 25 (June 2, 1976) (Testimony of Monroe Leigh, Legal Adviser, Department of State) (hereinafter Hearings)
 
 
 [11]
 Hearings, supra, Note 10 at 24 (Testimony of Monroe Leigh)
 
 
 [12]
 HAMLET: Do you see yonder cloud that's almost in shape of a camel?
 POLONIUS: By th' mass and 'tis, like a camel indeed.
 HAMLET: Methinks it is like a weasel.
 POLONIUS: It is backed like a weasel.
 HAMLET: Or like a whale.
 POLONIUS: Very like a whale.
 Wm. Shakespeare, Hamlet, Prince of Denmark, Act III, ii (Peng. ed. 1969).